OPINION OF THE COURT
 

 Ciparick, J.
 

 The common issue on these appeals is the nature of the showing of dangerousness required to retain an insanity acquittee
 
 *272
 
 in a non-secure psychiatric facility pursuant to Criminal Procedure Law § 330.20. Because the records in these cases are unclear as to whether the hearing courts conducted sufficient inquiry or made the necessary findings regarding dangerousness, we reverse and remit to those courts for farther proceedings in accordance with this opinion.
 

 I
 

 Matter of David B.
 

 David B. appeals an order of Supreme Court directing his continued retention in a non-secure psychiatric facility. In January 1970, while riding in a car, David B. stabbed his brother in the chest with a knife believing that he was responsible for their mother’s death. After stabbing his brother, David B. left him bleeding in the car and walked away from the scene.
 

 David B. was indicted for attempted murder and other crimes relating to the incident. However, pursuant to CPL article 730, he was found to be incompetent to stand trial and remanded to the custody of the Commissioner of Mental Health where he remained for four years. In 1974, he was found competent to stand trial, tried and found not guilty by reason of mental disease or defect. Under the insanity acquittal statutes in effect at the time of his trial, David B. was automatically committed to the custody of the Commissioner of Mental Health. He was sent to the Mid-Hudson Psychiatric Center, a secure facility, where he remained until 1977. In April 1977, he was transferred to the Kingsboro Psychiatric Center, a non-secure facility, where he remains to this day. At his first retention hearing, held pursuant to CPL 330.20 (8) in 1983, and at every subsequent retention hearing since then, David B. has been found to be “mentally ill” as that term is defined in CPL 330.20, supporting his continued retention in a non-secure facility.
 

 David B. is diagnosed with schizophrenia, paranoid type. In its most severe manifestations, the condition causes him to suffer paranoid delusions about people he knows, such as his brother, and even those whom he does not, such as members of the C.I.A. and F.B.I. He has also expressed the belief that his brother and his brother’s friend were working for the F.B.I. and conspiring to keep him in a psychiatric facility. In addition to his feelings of persecution, his 30-plus years of commitment have been marked by use of illicit drugs, periodic unexcused absences from Kingsboro and a refusal to take prescribed medications. David B. also shows a tendency to relapse when
 
 *273
 
 faced with the possibility of release. One clinician noted that he became angry and prone to outbursts prior to retention hearings. Most relevantly, the record indicates that he has occasionally expressed the belief that he does not suffer, or has not in the past suffered, from a mental illness. For that reason he often refuses to take medication or agree to conditions imposed upon his release, such as periodic checks of his whereabouts.
 

 David B.’s most recent retention hearing, which forms the basis of this appeal, began in April 1999. Three psychological experts testified. Although evidence of David B.’s past behavioral and clinical history was received at this hearing, when his attorney attempted to question the psychiatrist directly responsible for his daily treatment about his client’s history of recent acts of overt violence, the District Attorney objected. David B.’s attorney countered that, under
 
 Foucha v Louisiana
 
 (504 US 71 [1992]), a showing of both dangerousness and mental illness was necessary for continued involuntary commitment. The court sustained the District Attorney’s objection to the introduction of testimony as to David B.’s current dangerousness on the ground that under CPL 330.20 the State was only required to prove that David B. was “mentally ill.” Based on the evidence introduced at the hearing, the court concluded that “the People have proved by a preponderance of the evidence that [David B.] suffer[s] from a mental illness within the meaning of 330.20 of the code,” and ordered continued confinement in a non-secure facility.
 

 The Appellate Division affirmed, holding
 
 Foucha
 
 inapplicable to the facts of this case, inasmuch as the petitioner in that case was neither mentally ill nor dangerous, while David B.’s mental illness justified his retention in a non-secure facility. The Court cited CPL 330.20 (1) (c) (i) for the proposition that David B. suffered from a “mental illness” necessitating continued care in a non-secure facility. David B. appeals as of right on constitutional grounds pursuant to CPLR 5601 (b) (1).
 

 Matter of Richard S.
 

 The history of Richard S. is somewhat more complicated. In July 1980, Richard S. met a 15-year-old male, and took him to his home in Queens. After a night of sexual relations, appellant stabbed the young man with a pocket knife three times in the chest and back as he slept. Richard S. turned himself in and was charged with numerous crimes, including attempted murder in the second degree.
 

 
 *274
 
 At the time of his arrest, Richard S. was serving a five-year probationary manslaughter sentence for the 1978 killing of another young man who he had stabbed to death after sex. Richard S.’s probation was revoked and he was incarcerated pending a CPL article 730 competency hearing. This was the last time Richard S. was outside an institutional setting.
 

 After CPL article 730 examinations confirmed his competency to stand trial, Richard S. underwent an additional battery of psychiatric examinations focusing on his mental state at the time of the July 1980 stabbing. All the examining psychiatrists concurred that, at the time of the stabbing, Richard S. lacked the capacity to appreciate the nature and consequences of his actions and that he was in need of institutional treatment because of the danger he presented to himself and others. Upon an adjudication of not guilty by reason of mental disease or defect, he was committed to the custody of the Commissioner of Mental Health.
 

 Upon his arrival at Mid-Hudson Psychiatric Center (MHPC), a secure mental facility, two psychiatrists examined and diagnosed Richard S. with atypical psychosis, substance abuse disorder and a psychosexual disorder manifesting as egodystonic homosexuality. The doctors opined that Richard S. suffered from a “dangerous mental disorder”
 
 (see
 
 CPL 330.20 [1] [c]) requiring commitment in a secure facility. He remained at MHPC until 1986. In 1986, while undergoing hypnotic therapy, Richard S. allegedly recalled bludgeoning a third young man to death in an alley in Queens. Appellant was tried and convicted of that murder and sentenced to a prison term of 25 years to life. This Court, focusing on the unreliability of hypnotically induced statements, in 1991 reversed that conviction
 
 (People v Schreiner,
 
 77 NY2d 733). Following dismissal of the murder indictment, Richard S. was transferred back to and “retained” at MHPC under a subsequent retention order pursuant to CPL 330.20 (9) stemming from the 1980 stabbing incident.
 
 [1]
 

 In February 1994, Supreme Court ordered the transfer of Richard S. to a non-secure facility
 
 (People ex rel. Schreiner v
 
 
 *275
 

 Tekben,
 
 160 Misc 2d 724 [1994],
 
 affd sub nom. People ex rel. Richard S. v Tekben,
 
 219 AD2d 609,
 
 lv denied
 
 87 NY2d 803 [1995]). Richard S. was subsequently transferred to the Middle-town Psychiatric Center. Despite evidence of satisfactory progress in treatment and the beginning of a romantic relationship with a fellow patient, in 1996 appellant was found to be in possession of violent pornographic materials. At about the same time an informant was reputed to have alleged that appellant was planning an escape from Middletown in order to exact revenge upon a Queens Assistant District Attorney for a prior prosecution. Under an emergency transfer order pursuant to 14 NYCRR 57.2, in April 1996, Supreme Court returned Richard S. to secure commitment at MHPC.
 

 In October 1998, the Commissioner of Mental Health petitioned Supreme Court for a retention order at MHPC on the ground that Richard S. continued to suffer from a “dangerous mental disorder.” In extensive hearings, the Commissioner and the District Attorney presented evidence of appellant’s violent history and more recent setbacks when transferred to a less secure facility. Richard S.’s evidence focused on his treatment progress and his efforts to behave in more socially acceptable ways. Particularly, he claims that he no longer associates sexual gratification with acts of extreme violence. Supreme Court found that he did not suffer from a “dangerous mental disorder” but that he did suffer from a “mental illness which is presently in a state of remission” and should be afforded an opportunity to live in a less secure environment. The court did not elaborate on the necessity of continued treatment or appellant’s ability to understand the need for such treatment (see CPL 330.20 [1] [d]). In affirming the hearing court’s decision, the Appellate Division noted that the Commissioner failed to show by a preponderance of the evidence that Richard S.’s mental condition caused him to “currently [constitute] a physical danger to himself or others” as required by CPL 330.20 (1) (c) (ii), but, citing to CPL 330.20 (1) (c) (i), held that he should be retained in a non-secure facility because he “still suffers from a ‘mental illness’”
 
 (Matter of Richard S.,
 
 278 AD2d 496, 497 [2000]). Richard S. appeals as of right on constitutional grounds pursuant to CPLR 5601 (b) (1).
 

 II
 

 Appellants argue that continued retention based solely upon a finding of “mental illness” without a concomitant finding of dangerousness violates their rights to substantive due process
 
 *276
 
 of law. Both mental illness and dangerousness are necessary elements of any commitment or retention of an insanity acquit-tee
 
 (see Jones v United States,
 
 463 US 354 [1983]). Neither a showing of mental illness alone, nor dangerousness alone, will satisfy the requirements of due process when an individual’s right to liberty is at stake
 
 (see Foucha,
 
 504 US 71). Indeed, all parties now agree that there is a constitutionally required minimum level of dangerousness to oneself or others that must be shown before an insanity acquittee may be retained in a non-secure facility, and that a finding that an individual is “mentally ill” as defined under CPL 330.20 (1) (d) contemplates a degree of dangerousness that satisfies due process concerns. In these appeals, we must determine what the required level of dangerousness is and whether the courts below applied that standard in these cases.
 

 In 1980, the Legislature passed the Insanity Defense Reform Act (L 1980, ch 548). That statute, codified as CPL 330.20, provides for confinement of an insanity acquittee at either a secure or non-secure facility, and contains a set of definitions applicable to such determinations. Under the amended CPL scheme, a person who has successfully asserted an insanity defense may be classified at an initial commitment hearing as Track 1, having a “dangerous mental disorder” (CPL 330.20 [1] [c]);
 
 [2]
 
 Track 2, being “mentally ill” and in need of further institutional treatment (CPL 330.20 [1] [d]);
 
 [3]
 
 or Track 3, neither suffering from a “dangerous mental disorder” nor being “mentally ill,” in which case a release order with conditions must issue.
 
 [4]
 
 In the context of subsequent retention hearings pursuant to CPL 330.20 (9), a determination that one continues
 
 *277
 
 to suffer from a “dangerous mental disorder” will result in continued confinement in a secure psychiatric facility while a finding that an individual does not have a dangerous disorder but is “mentally ill” results in transfer to or retention in a non-secure facility
 
 (id.).
 

 “Mentally ill” under CPL 330.20 (1) (d) has three distinguishing characteristics: (1) the illness is of a kind that
 
 requires inpatient care and treatment,
 
 (2) care and treatment of the illness are
 
 essential to the defendant’s welfare,
 
 and (3) because of impaired judgment the defendant
 
 does not understand the need for such care and treatment.
 
 Although the word “dangerous” does not appear in the statute, the constitutionally required element of dangerousness to oneself or others is subsumed in the language of the provision.
 
 [5]
 

 Although this Court has not previously been called upon to examine the dangerousness requirement as it applies to the retention of insanity acquittees in non-secure facilities, we have done so with respect to retention in secure facilities. In
 
 Matter of George L.
 
 (85 NY2d 295 [1995]), we stated that generally a finding of a defendant’s current dangerousness for purposes of CPL 330.20 (1) (c) (ii)
 

 “must be based on more than expert speculation that he or she poses a risk of relapse or reverting to violent behavior once medical treatment and supervision are discontinued. The prosecution may meet its burden of proving that a defendant poses a current threat to himself or others warranting
 
 *278
 
 confinement in a secure environment, for example, by presenting proof of a history of prior relapses into violent behavior, substance abuse or dangerous activities upon release or termination of psychiatric treatment, or upon evidence establishing that continued medication is necessary to control defendant’s violent tendencies and that defendant is likely not to comply with prescribed medication because of a prior history of such noncompliance or because of threats of future noncompliance”
 
 (id.
 
 at 307-308 [citation omitted]).
 

 Later that same year, in
 
 Matter of Francis S.,
 
 we affirmed a recommitment order, holding that relapses into violent behavior, substance abuse and non-compliance with treatment requirements were all sufficient indicators of present dangerousness for purposes of secure confinement to a psychiatric facility (87 NY2d 554, 561 [1995]).
 

 Both
 
 George L.
 
 and
 
 Francis S.
 
 involved sufficiency of evidence challenges to an adjudication of a “dangerous mental disorder” under CPL 330.20 (1) (c). Although subdivision (1) (c) addresses the prerequisites for confinement in a secure facility and, unlike subdivision (1) (d), expressly requires a finding of dangerousness, these cases also help define the limits of evidence necessary to justify confinement in a non-secure facility under the less stringent requirements of subdivision (1) (d). Precisely because CPL 330.20 is structured with a stepped-down system of confinement options, with individuals suffering from dangerous mental disorders committed to secure facilities, proceeding to less restrictive modes of confinement, it stands to reason that the minimum showing necessary for a higher level of dangerousness also helps to define the requirements of danger for the next step-down level of confinement— “mentally ill” individuals who are placed in non-secure facilities (CPL 330.20 [1] [d]).
 

 Although a finding of dangerousness may be supported by evidence of violence, dangerousness is not coterminous with violence. In
 
 Jones v United States
 
 (463 US 354 [1983]), the Supreme Court observed that it has never held that violence is a prerequisite for a constitutional confinement. Indeed the
 
 Jones
 
 Court noted that, aside from any threat of violence, petitioner’s continued confinement “may well rest” on his history of suicidal tendencies and his inability to cope with release
 
 (id.
 
 at 365 n 14).
 

 Apart from evidence of violence, retention of an insanity acquittee in a non-secure facility is justified where the State
 
 *279
 
 shows by a preponderance of the evidence that continued care and treatment are essential to the physical or psychological welfare of the individual and that the individual is unable to understand the need for such care and treatment. Retention also may be supported by the need to prepare for a safe and stable transition from non-secure commitment to release. Thus, in addition to recent acts of violence and the risk of harm to the defendant or others that would be occasioned by release from confinement, a court may consider the nature of the conduct that resulted in the initial commitment, the likelihood of relapse or a cure, history of substance or alcohol abuse, the effects of medication, the likelihood that the patient will discontinue medication without supervision, the length of confinement and treatment, the lapse of time since the underlying criminal acts and any other relevant factors that form a part of an insanity acquittee’s psychological profile (see
 
 e.g. George L.,
 
 85 NY2d at 308).
 
 [6]
 
 While these determinations include many of the same factors we identified as relevant in
 
 George L.,
 
 they need not be as pronounced in the case of retention in a non-secure facility.
 

 Because the statutory language limits the class of retained mentally ill individuals to those who must have inpatient care and treatment and those unable to understand their need for treatment, due process concerns are satisfied. The requirement that inpatient care be essential assures that only those who must have care will receive it. Moreover, the requirement that the individual not understand the need for such care assures retention only of those who would not seek care or may fail to follow treatment conditions if released. In sum, the criteria for mental illness under CPL 330.20 (1) (d) satisfy the constitutional requirement of “dangerousness.” For that reason the statute is constitutional on its face and can be so applied in initial commitment and subsequent retention hearings.
 

 m
 

 Given the Appellate Division’s error in citing to CPL 330.20 (1) (c) (i) as a basis for retention in a non-secure facility, and the lack of factual findings, it is unclear whether that Court applied a standard that included consideration of the danger
 
 *280
 
 that appellants could present to themselves or others, if released. In both cases, there was no finding that continued treatment was essential to their welfare, nor discussion of impaired judgment rendering the appellants unable to understand the need for such continued care and treatment.
 

 In the case of
 
 David B.,
 
 it appears that the hearing court may have precluded appellant from introducing evidence related to dangerousness. Thus, upon remittal, the court in its discretion may rely on the record as it exists or allow additional relevant evidence that it deems appropriate. We do not see the need here for a de novo hearing. Similarly in
 
 Richard S.,
 
 Supreme Court must weigh the evidence using the proper standard — including the dangerousness component — and should likewise rely on the existing record in addition to any further evidence the court deems necessary.
 

 Accordingly, in each case, the order of the Appellate Division should be reversed, with costs, and the matter remitted to Supreme Court for further proceedings in accordance with this opinion.
 

 Chief Judge Kaye and Judges Smith, Levine, Wesley, Rosenblatt and Graffeo concur.
 

 In
 
 Matter of David B.:
 
 Order reversed, with costs, and matter remitted to Supreme Court, Kings County, for further proceedings in accordance with the opinion herein.
 

 In
 
 Matter of Richard S.:
 
 Order reversed, with costs, and matter remitted to Supreme Court, Orange County, for further proceedings in accordance with the opinion herein.
 

 [1]
 

 . Because Richard S. had been in the custody of the Department of Correction since his 1986 arrest and murder indictment, the two-year subsequent retention order under which he had been retained at MHPC expired on August 16, 1989 without being renewed. Appellant’s subsequent retention proceeding after a lapse of two years during which no retention order was in effect was the subject of a separate unsuccessful appeal
 
 (Matter of Richard S.,
 
 208 AD2d 750 [1994]).
 

 [2]
 

 . CPL 330.20 (1) (c) provides that
 

 “ ‘Dangerous mental disorder’ means: (i) that a defendant currently suffers from a ‘mental illness’ as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others.”
 

 [3]
 

 . CPL 330.20 (1) (d), in relevant part, defines a perspn who is “mentally ill” as one who
 

 “currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant’s welfare and that his judgment is' so impaired that he is unable to understand the need for such care and treatment * *
 

 [4]
 

 . Although the same CPL 330.20 definitions are used both at the initial examination
 
 (see
 
 CPL 330.20 [2]-[6]) as well as at first and subsequent retention examinations
 
 (see
 
 CPL 330.20 [8], [9]), the effect of track placement at
 
 *277
 
 the initial commitment hearing is significant. At the initial examination, only a finding that one suffers from a “dangerous mental disorder” (Track 1) results in continued, direct, oversight by this section (CPL 330.20 [6]). Those found to be “mentally ill” (Track 2) are remanded to the Commissioner with conditions authorized under the Criminal Procedure Law, but their commitments are governed by the civil commitment provisions of the Mental Hygiene Law (CPL 330.20 [7];
 
 see also Matter of Jill ZZ.,
 
 83 NY2d 133 [1994]). Track 3 acquittees, fitting neither the definition of “dangerous mental disorder” nor “mentally ill,” are entitled to immediate release with or without conditions (CPL 330.20 [7]). Track 2 and Track 3 individuals may, however, be reclassified as Track 1 and thus brought back under CPL 330.20 oversight at a subsequent recommitment hearing (CPL 330.20 [14]).
 

 [5]
 

 . [1] We do not believe, as the Appellate Division decisions in both cases suggest, that a finding of mental illness pursuant to CPL 330.20 (1) (c) (i) is sufficient to justify commitment to a non-secure facility. That clause, which refers to the definition of mental illness found in Mental Hygiene Law § 1.03 (20), is but one prong of the two-prong “dangerous mental disorder” test in CPL 330.20 (1) (c). Mental Hygiene Law § 1.03 (20) merely defines “mental illness” without considering factors relating to dangerousness to self or others that would satisfy due process concerns before commitment can take place.
 

 [6]
 

 . Although not controlling here, these factors are often the same ones considered in civil commitment cases
 
 (see e.g. Matter of Harry M.,
 
 96 AD2d 201 [1983];
 
 Matter of Seltzer v Hogue,
 
 187 AD2d 230 [1993];
 
 Matter of Naila Y. v Sanchez,
 
 215 AD2d 183 [1995];
 
 Matter of John P.,
 
 265 AD2d 559 [1999]).