■ In the Matter of JAMES M., Respondent, v EILEEN CONSILVIO, as Executive Director of KIRBY FORENSIC PSYCHIATRIC CENTER, Appellant. [774 NYS2d 506]—

Orders, Supreme Court, New York County (Debra James, J.), entered on or about March 18, 2003, which, upon a finding after rehearing and review that petitioner suffers from a mental disorder, directed that petitioner be transferred from a secure to a nonsecure mental health facility and imposed certain terms and conditions, unanimously reversed, on the law and the facts, without costs, petitioner found to suffer from a dangerous mental disorder, and appellant's application for a retention order in a secure facility granted.

In April 1987, petitioner James M. was charged in Suffolk

County with attempted murder in the second degree and related crimes stemming from an incident in which he fired a shotgun at a man outside a bar and then shot the weapon through the window. On November 8, 1988, petitioner pleaded not responsible by reason of mental disease or defect to the crimes of attempted murder in the second degree and reckless endangerment in the first degree. Consequently, petitioner was committed to the custody of the Commissioner of the Office of Mental Health (the Commissioner) pending further proceedings pursuant to CPL 330.20.

After an initial finding that petitioner had a "dangerous mental disorder" as defined by CPL 330.20 (1) (c),* the court issued a commitment order directing the Commissioner to place him in a secure facility. After spending about eight months at Mid-Hudson Forensic Psychiatric Facility, a secure facility, petitioner was transferred pursuant to court order to Binghamton Psychiatric Center (Binghamton), a nonsecure facility where he stayed for the next four years.

Petitioner did fairly well at Binghamton, took his medication, and was granted furloughs. He owned a car and had an apartment where he lived with his girlfriend while on furloughs. However, petitioner abused these privileges. Specifically, petitioner took a female patient for a ride in his car, showed her a knife, and failed to return on time. He also engaged in several instances of verbally abusive and threatening behavior, including forced sexual relations with female patients. Consequently, petitioner's privileges were revoked, and he was returned to more restrictive confinement. His privileges were restored upon improvement of his behavior.

On December 6, 1993, as a result of allegations of sexual misconduct and harassment by various female patients, petitioner was transferred on an emergency basis to Kirby Forensic Psychiatric Center (Kirby), a secure facility. On March 31, 1994, the Commissioner applied for and subsequently obtained a recommitment order, and petitioner has been confined at Kirby under successive retention orders ever since.

This appeal arises from the Commissioner's most recent (February 2001) application for a retention order. After holding a hearing, the Supreme Court (William McCooe, J.), determined that petitioner continued to suffer from a "dangerous mental disorder" and signed an order authorizing his continued reten-

---

* CPL 330.20 (1) (c) provides in relevant part that: " 'Dangerous mental disorder' means: (i) that a defendant currently suffers from a 'mental illness' . . ., and (ii) that because of such condition he currently constitutes a physical danger to himself or others."

tion in a secure facility. Petitioner sought rehearing and review of this determination pursuant to Mental Hygiene Law § 9.35 and CPL 330.20 (16), and a different judge (Debra James, J.) presided over the rehearing before a jury.

Petitioner was represented by Mental Hygiene Legal Services at the rehearing. The Attorney General appeared on behalf of appellant Consilvio, Director of Kirby. The District Attorney also appeared and presented evidence, pursuant to statute, in support of appellant's application (*see* CPL 330.20 [8]).

At the rehearing, David Weber, an independent psychiatric examiner appointed by the court, and Dr. Raphael Morris, a staff psychiatrist at Kirby and petitioner's treating psychiatrist for three months in 2001, testified on behalf of appellant. Dr. Weber and Dr. Morris both concluded that petitioner suffered from a mental illness and had a dangerous mental disorder. Both doctors diagnosed petitioner as suffering from bipolar disorder, substance abuse disorder, and antisocial personality disorder. Dr. Morris added that petitioner also suffered from borderline personality disorder. Although petitioner's bipolar disorder was treatable with medication, his antisocial personality disorder was not. Rather, the only known effective treatment for that disorder is placement in a highly structured behavior management setting.

The doctors' respective conclusions that petitioner continues to suffer from a dangerous mental disorder were based in part upon petitioner's past dangerous behavior. Specifically, Dr. Weber explained that petitioner, who experienced a high level of frustration, frequently, if not always, resorted to threats of violence when he did not get his way. The medical testimony also revealed that petitioner had a pattern of ignoring directions from staff members and threatening them. Petitioner also threatened to escape on numerous occasions and threatened to hurt himself when depressed.

In support of their respective conclusions that petitioner continued to suffer from a dangerous mental disorder, both doctors related recent episodes, the most recent of which occurred shortly before the rehearing. Specifically, in October 2000, petitioner became very angry with a staff member and threatened to kill him. In January 2001, petitioner brandished a handful of nails in the wood shop. More recently, in April 2002, a "shiv" was found in his private locker. On June 13, 2002, petitioner became upset with a treatment team leader and other staff members on the unit after being confronted about making "veiled" threats that he could escape, take hostages and smuggle in weapons, and that anything was a potential weapon,

even a watch. The staff thought it best for petitioner to remove his watch, and he became increasingly agitated. Petitioner removed something from his mouth and threatened to cut himself. The staff had to clear out the room and ask the safety officers to come in. It took the staff at least an hour to calm petitioner down and get him to take some medication. On September 6, 2002, petitioner rushed a treatment team leader and had to be "redirected." On November 8, 2002, he threatened to hit a therapy aide who requested that petitioner not ask other more vulnerable patients to give him their food. On December 4, 2002, less than two months before his rehearing, petitioner threatened to "knock out" a therapy aide in order to go to jail because he was frustrated at being in the hospital.

In further support of their conclusion that petitioner continued to pose a danger to himself and others, the doctors testified that petitioner did not demonstrate insight or remorse for the crime that caused him to be hospitalized or his current medical condition. They explained that petitioner's lack of insight made it hard to treat him, especially in a less controlled environment. Moreover, the fact that petitioner, in the controlled environment of a secure facility, was currently taking medication and had no access to contraband drugs was no indication how he would fare in a less controlled environment, given his lack of insight into his medical condition.

Petitioner's vocational rehabilitation counselor at Kirby testified on his behalf. Her testimony consisted of her own personal experiences with petitioner in which she claimed that she did not feel threatened by him and that petitioner had never been sexually inappropriate toward her.

At the rehearing, petitioner testified that he did not consider himself to be mentally unstable. Petitioner admitted to the various incidents but explained them away without ever attributing any fault to himself. For example, he claimed that he was merely engaging in horseplay when he kicked a patient in the ribs. He also admitted that one month before the rehearing he had threatened violence if his ward was made co-ed, but explained he did not want a recurrence of the "situation at Binghamton."

The jury found, by a five to one vote, that petitioner currently suffers from a mental illness which requires care and treatment as an inpatient in a psychiatric center, that such care and treatment is essential to his welfare, and that his judgment is so impaired that he is unable to understand the need for such care and treatment. However, by a five to one vote, the jury found that petitioner does not suffer from a dangerous mental disorder.

The court concluded that the jury's finding on the issue of whether petitioner suffered from a dangerous mental disorder was merely advisory and, therefore, conducted an independent review of the evidence on that issue. The court agreed with the jury's assessment and concluded that the evidence did not preponderate on either side, and, therefore, appellant failed to meet her burden of proof on the issue of dangerousness. The court further concluded that petitioner's verbally threatening behavior, while a manifestation of his mental illness, did not establish dangerousness. On March 18, 2003, the court issued a transfer order and an order of conditions directing that petitioner be transferred to a nonsecure facility. This Court granted appellant leave to appeal from the orders and stayed petitioner's transfer to a nonsecure facility pending the determination of this appeal.

On appeal, appellant and the District Attorney argue that there is simply no fair interpretation of the evidence to support the rehearing court's determination that petitioner did not have a dangerous mental disorder. Petitioner does not challenge the finding that he continues to be mentally ill. Rather, his principal appellate contention is that the jury's determination was not merely advisory and both its and the court's findings should be upheld.

CPL 330.20 provides for the confinement of an insanity acquittee, such as petitioner, who has been found not guilty of a crime by reason of mental disease or defect pursuant to CPL 220.15, to either a secure or nonsecure mental health facility. The nature of the facility depends on whether the defendant is found at the initial commitment hearing to be suffering from a dangerous mental disorder (CPL 330.20 [1] [c]) or is mentally ill and in need of further institutional treatment (CPL 330.20 [1] [d]; *see also* CPL 330.20 [1] [f]; [6], [7]). Thereafter, the Commissioner must apply to the court for further retention orders (CPL 330.20 [8], [9]). If the insanity acquittee is dissatisfied with the court's determination, he or she may request a rehearing and review. The separate question of mental illness shall be tried before a jury (CPL 330.20 [16]; Mental Hygiene Law § 9.35).

On appeal, petitioner claims that the court's conclusion that the jury's finding on the issue of dangerousness is advisory is questionable. However, recent appellate authority holds otherwise. Indeed, the Appellate Division has found that "[t]here is no specific provision in the statute for a jury determination of the issues of 'dangerous mental disorder' and the need for retention in a secure facility or transfer to a nonsecure

facility." (*Matter of Richard H. v Consilvio*, 6 AD3d 7, 14 [2004].) Thus, "those issues are excluded from the jury's province," but the court may consider the jury's determination regarding them in an advisory capacity (*id.*; *see also Matter of Norman D.*, 309 AD2d 143, 148 [2d Dept 2003], *lv granted* 1 NY3d 503 [2003]; *Matter of Watkins R. v Berry*, 276 AD2d 492, 493 [2d Dept 2000]; *Barber v Rochester Psychiatric Ctr.*, 250 AD2d 87, 90 [4th Dept 1998]).

In order to obtain a further retention order, the Commissioner had to establish petitioner's mental disorder by a fair preponderance of the credible evidence (*see People v Escobar*, 61 NY2d 431 [1984]). Appellant and the District Attorney both argue that this Court should grant appellant's application for a retention order since the Judge's and the jury's determination cannot be supported under any fair interpretation of the evidence. Since the jury's determination regarding the critical issue on appeal, i.e., whether petitioner continues to suffer from a dangerous mental disorder, is merely advisory, our standard of appellate review is different than if the jury verdict carried any binding authority.

As a general rule, findings of fact of a trial court should not be disturbed (*Matter of Boggs v New York City Health & Hosps. Corp.*, 132 AD2d 340, 362 [1987], *appeal dismissed* 70 NY2d 972 [1988]). However, that rule gives way when "such findings could not have been reached under any fair interpretation of the evidence" (*City Univ. of N.Y. v Finalco, Inc.*, 129 AD2d 494, 495 [1987]). Thus, in a nonjury case, an appellate court "may grant the judgment which, upon the evidence, should have been granted by the trial court [citation omitted] after having given appropriate weight to the credible evidence adduced [citation omitted]" (*Hager v Mooney Aircraft*, 63 AD2d 510, 524 [1978]; *accord De Mayo v Yates Realty Corp.*, 35 AD2d 700 [1970], *affd* 28 NY2d 894 [1971]). Indeed, the authority of the Appellate Division "is as broad as that of the trial court" (*Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983]).

We agree with appellant and the District Attorney that there is no fair interpretation of the evidence which favors releasing petitioner to a nonsecure facility. We base this determination not by ignoring the progress petitioner may have made in the past, but rather by giving due weight to the accounts of the most recent, troubling incidents proven at the rehearing. In determining whether an insanity acquittee constitutes a current physical danger to himself or others and is therefore in need of secure retention, the courts may consider the nature and

recency of the defendant's criminal act; evidence of a history of relapses into violent behavior; substance abuse or dangerous activities upon release or termination of psychiatric treatment; or evidence establishing that continued medication is necessary to control the defendant's violent tendencies and that the defendant is not likely to comply with prescribed medication either because of a prior history of noncompliance or because of threats of future noncompliance (*Matter of George L.*, 85 NY2d 295, 307-308 [1995]).

Although petitioner's criminal act occurred many years ago, we note its violent nature. In any event, while petitioner may have experienced some progress in his recovery at a nonsecure facility, the most recent episodes tell a different story. The fact that petitioner has not, to date, actually injured someone is simply fortuitous. Even though petitioner's outbursts and threatening behavior have not resulted in actual physical violence, we nevertheless determine that he continues to pose a danger to himself or others. Indeed, "dangerousness is not coterminous with violence" (*Matter of David B.*, 97 NY2d 267, 278 [2002]). Moreover, violence is not "a prerequisite for a constitutional confinement" (*id.*, relying on *Jones v United States*, 463 US 354 [1983]).

To further support our conclusion, we note that petitioner lacks insight into his illness, fails to take responsibility for his actions, and continues to engage in verbally threatening behavior. These are impediments to his recovery, especially were he to transfer to a less controlled environment where he would be able to more readily act on his threats. Even accepting, as petitioner claims, that the record does not support a finding that he is noncompliant with drugs, the fact that he is on medication and not abusing other substances has apparently not inured to his benefit. We find it unpersuasive, if not irrelevant, that petitioner's treatment team in 2000 recommended his transfer to a nonsecure facility, where the incidents on which we rely to assess the current state of his mental health occurred thereafter.

Accordingly, appellant's application for a retention order is granted. Concur—Andrias, J.P., Saxe, Sullivan and Marlow, JJ.