Skelos, J.
(concurring in part and dissenting in part). Upon the application for a subsequent retention order to continue the respondent’s confinement in a secure psychiatric facility, the Supreme Court determined that the respondent neither had a “ [d] angerous mental disorder” nor was “[m]entally ill” (CPL *179 330.20 [1] [c], [d]), and directed that the respondent be released upon an order of conditions. The majority concludes that, contrary to the Supreme Court’s determination, the appellants met their burden of proving that the respondent had a “[d] anger ous mental disorder” (CPL 330.20 [1] [c]), requiring his continued confinement in a secure psychiatric facility. We disagree and conclude, as a matter of law, that without regard to the case presented by the respondent, the appellants failed to make a prima facie showing that the respondent suffered from a “[d] anger ous mental disorder” (id.). Instead, we find, contrary to the Supreme Court’s determination, that the appellants demonstrated that the respondent was “[mjentally ill” (CPL 330.20 [1] [d]), such that a retention order should be issued, but that the respondent should be transferred to a nonsecure psychiatric facility. Therefore, we concur in part and dissent in part.
In 1994, the respondent entered a plea of not responsible by reason of mental disease or defect (see Penal Law § 40.15) to a charge of attempted murder in the second degree, which was based upon an incident in which he stabbed his then second wife, Susan. In 1995, after a hearing, and upon evaluations by two psychiatrists, who diagnosed the respondent with bipolar disorder, the respondent was found to have a “[d]angerous mental disorder” (CPL 330.20 [1] [c]), and was confined to Kirby Forensic Psychiatric Center (hereinafter Kirby), a secure facility (see CPL 330.20 [6], [1] [f]).
In June 2000, upon the recommendation of members of his treatment team at Kirby, as well as a forensic evaluation by a staff psychiatrist at Kirby and an independent forensic evaluation, both finding that the respondent was no longer dangerously mentally ill, the respondent was transferred to Middle-town Psychiatric Center (hereinafter Middletown), a nonsecure facility.
While at that facility, it was noted that the respondent “would become agitated, loud, and confrontational when he perceived injustices against him or was asked to follow the ward procedures.” However, it was specifically noted that the respondent “had not displayed any assaultive behavior.” The types of problematic behaviors in which the respondent engaged at Middletown included shouting matches with patients over use of the computer, obsessive writing of letters and legal documents concerning perceived wrongs against him, using communal spaces as his private “office,” writing letters to female staff members expressing romantic interest, forbidding patients *180 to use the telephone, making derogatory remarks to a patient, threatening to write up staff members and to get them suspended or have their licenses revoked, and only minimally participating in therapy. Based upon these behaviors, Middle-town was granted permission, in 2002, to medicate the respondent over his objection. However, Middletown determined not to request permission to give the respondent antipsychotic medications, as opposed to mood stabilizers, since he showed “no clinical evidence of any overt psychotic symptoms.”
In October 2003, upon an order of the Supreme Court, the respondent was released from Middletown with an order of conditions (see CPL 330.20 [12]). During that time, the respondent lived with his mother, participated in outpatient therapy, worked to restore his business, and, on one occasion, presented himself to a hospital for inpatient psychiatric care when he felt depressed. In February 2005, Susan reported to the police that she had received three telephone calls from the respondent (one of which was a voice-mail message), in violation of an order of protection. Susan reported that the respondent had told her that he loved her and asked her to go out to dinner with him. Upon a plea of guilty, the respondent was convicted of criminal contempt and sentenced to one year in jail. While in jail, the respondent was evaluated by a psychiatrist, who recommended inpatient hospitalization based upon the respondent’s “continued litigiousness, his grandiosity, and his minimization of his past acts of violence.” Four months later, the psychiatrist amended his report to indicate that the respondent was “dangerously mentally ill” and in need of treatment at a secure facility. In October 2005, the respondent was admitted to Mid-Hudson Forensic Psychiatric Center (hereinafter Mid-Hudson), a secure facility.
While confined at Mid-Hudson, the respondent refused to take medication, and questioned his psychiatric diagnosis. He also reportedly antagonized patients and made hurtful and inappropriate comments to them, made derogatory comments and was verbally abusive to staff, refused to comply with staff directives, “hoard[ed]” legal papers, refused to shower, threw a cup of water on a staff member, and knocked a cup of coffee out of a staff member’s hand. In October 2006, the respondent placed a pen on a patient’s throat, and the following month, punched a patient. A few days after that episode, Mid-Hudson made an application for authorization to medicate the respondent over his objection. The respondent was also medicated over his objection *181 a number of times in 2011 and 2012, “after displaying rapid, pressured speech, flight of ideas, and paranoid ideation,” as well as unspecified “agitated” behavior. In applying to medicate the respondent over objection, the respondent’s treating doctor indicated that he was “mainly afraid that [the respondent would] have another heart attack” from becoming so agitated.
On September 22, 2011, the present application was made for a subsequent retention order (see CPL 330.20 [9]), to continue the respondent’s confinement at Mid-Hudson for a period not to exceed two years, based upon the view that the respondent continued to suffer from a “[d]angerous mental disorder” (CPL 330.20 [1] [c]). In support of the application, Mid-Hudson submitted forensic psychiatric reports authored by staff psychologist Patricia Simon-Phelan, and psychiatrist Michael H. Stone. Simon-Phelan and Stone both diagnosed the respondent with bipolar disorder and a personality disorder, and opined, based upon the history of the respondent’s prior confinement, as detailed above, and his lack of insight into his illness and refusal to take medication, that the respondent had a “dangerous mental disorder.”
A hearing was held on the application, at which Simon-Phelan testified that she believed that the respondent was a danger to others because it was her opinion that “he would try to harm” Susan. Simon-Phelan further opined that the respondent was a danger to himself because “[h]e aggravates other patients so much that if anyone were to hit him, then he would be in danger of having a stroke.” Similarly, the respondent’s treating psychiatrist, Peter Formica, when asked whether the respondent was a danger to himself and others, indicated that he was “a danger mainly to himself’ because he provokes the other patients. Formica also predicted that the respondent would be a danger to Susan if he were released to the community.
In opposition, the respondent presented evidence from psychologist Allison Conner, who opined that the respondent did not suffer from bipolar disorder, and that he did not require any mental health treatment. The respondent further presented evidence from psychiatrist Quazi Al-Tariq, who agreed with Conner that the respondent was not bipolar, or “[mjentally ill” as that term is defined in CPL 330.20 (1) (d), although he acknowledged that he concurred in a report issued in June 2009, which found the respondent to be suffering from bipolar disorder and in need of continued confinement at that time.
The Supreme Court concluded that the respondent did not have a “[d]angerous mental disorder” and was not “[mjentally *182 ill” (CPL 330.20 [1] [c], [d]), such that he should be released upon an order of conditions (see CPL 330.20 [12]).
If, upon a hearing on an application for subsequent retention of a defendant in a secure facility, the court determines that the defendant has a “dangerous mental disorder,” it must issue a subsequent retention order (CPL 330.20 [9]). “Dangerous mental disorder” means that “a defendant currently suffers from a ‘mental illness’ as that term is defined in [Mental Hygiene Law § 1.03 (20)]” and “that because of such condition he currently constitutes a physical danger to himself or others”* (CPL 330.20 [1] [c]; see Matter of George L., 85 NY2d 295, 302 [1995]).
If, however, the court finds that the defendant is “mentally ill but does not have a dangerous mental disorder,” it must issue a subsequent retention order, along with an order transferring the defendant to a nonsecure facility and an order of conditions for the transfer (CPL 330.20 [9]; see CPL 330.20 [11]; Mental Hygiene Legal Servs. v Wack, 148 AD2d 341, 343 [1989]). For purposes of CPL 330.20, “[mjentally ill” means
“that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center ... is essential to such defendant’s welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment” (CPL 330.20 [1] [d]).
Although not expressly stated in the statutory definition of “mentally ill,” in order to satisfy due process concerns, “a constitutionally required minimum level of dangerousness to oneself or others . . . must be shown before an insanity acquit-tee may be retained in a non-secure facility” (Matter of David B., 97 NY2d 267, 276 [2002]). However, “the concept of danger necessary to justify confinement in a nonsecure facility is not equivalent to the heightened dangerousness finding — dangerous mental disorder — that justifies placement in a secure facility” (Matter of Jamie R. v Consilvio, 6 NY3d 138, 152 n 12 [2006]). Rather, the Court of Appeals has held that “the criteria for mental illness” provided in CPL 330.20 (1) (d) “satisfy the *183 constitutional requirement of ‘dangerousness’ ” (Matter of David B., 97 NY2d at 279). In other words, the findings that inpatient care is necessary and that the individual does not understand the need for such care are sufficient to satisfy the minimum level of dangerousness required to retain an individual in a nonsecure facility (see id.).
Here, although the appellants demonstrated that the respondent is “[m]entally ill” (CPL 330.20 [1] [d]), so as to warrant his retention in a nonsecure facility, they failed, as a matter of law, to meet their burden of demonstrating by a preponderance of the evidence (see People v Escobar, 61 NY2d 431 [1984]) that the respondent was suffering from a “[d]angerous mental disorder” (CPL 330.20 [1] [c]), so as to justify his continued confinement in a secure facility.
In Matter of George L. (85 NY2d 295 [1995]), the Court of Appeals discussed the showing necessary to support a finding of current dangerousness, so as to warrant retention in a secure facility. It explained:
“[t]he prosecution may meet its burden of proving that a defendant poses a current threat to himself or others warranting confinement in a secure environment, for example, by presenting proof of a history of prior relapses into violent behavior, substance abuse or dangerous activities upon release or termination of psychiatric treatment, or upon evidence establishing that continued medication is necessary to control defendant’s violent tendencies and that defendant is likely not to comply with prescribed medication because of a prior history of such noncompliance or because of threats of future noncompliance” (id. at 308).
In that case, the appellant, who suffered from acute paranoid schizophrenia, was confined in a psychiatric hospital after having assaulted his father (see id. at 298). The appellant was subsequently released, upon the opinions of his doctors that he was compliant with his medications and had gained insight into his illness (see id.). However, only 10 days after his release, the appellant attacked his father with a hunting knife (see id. at 299). Seventeen months later, the appellant was found to be suffering from a “[d]angerous mental disorder” (CPL 330.20 [1] [c]). The Court of Appeals affirmed that finding, stressing “the peculiar circumstances of appellant’s relapse” and the fact that his “behavior had already once frustrated the presumably rea *184 sonable expectations of mental health professionals” (Matter of George L. at 308). Further, the Court indicated that the violent nature of the defendant’s criminal act constituted significant evidence of his dangerousness because that act had occurred only 17 months earlier, and that the lack of any more recent violence was not particularly significant, since the appellant had been “tranquilized” and confined for the entire 17-month period following the crime (id. at 307).
In a similar vein, the Court of Appeals affirmed a finding that the appellant was suffering from a “dangerous mental disorder” in Matter of Francis S. (87 NY2d 554, 561 [1995]), based upon the appellant’s “history of prior relapses into violent behavior and of recurrent substance abuse and noncompliance with treatment programs upon release” (id. at 561 [emphasis added]).
In contrast, the circumstances in the respondent’s case do not support the heightened dangerousness finding required for retention in a secure facility. The only evidence of violent conduct offered by the appellants, other than the 1994 offense against Susan, was the respondent’s acts, six years before the hearing, of holding a pen to a patient’s throat and punching a patient, and five years before the hearing, of knocking a cup of coffee out of a staff member’s hand. While there are vague references to “assault” in Simon-Phelan’s psychiatric report, there is no description of, or other facts pertaining to, any specific assault committed by the respondent. Simon-Phelan’s report is similarly vague as to the reason that the respondent was periodically placed on close supervision, indicating that he was placed on close supervision for “provocative behavior,” for his own protection against assault by others, and once, simply, “for assault.” In the same vein, although the respondent was reported to have “threatened” staff or patients, there is no indication that any of these threats were violent in nature, as opposed, for example, to threats of lawsuits or to staff members’ employment status. Further, while applications to medicate the respondent over objection were made on a number of occasions, only one of those occasions — stemming from the incident, six years prior to the hearing, in which the respondent punched a patient — was related to any violent behavior on his part. Rather, the applications were made, in large part, due to the respondent’s manifestation of typical, nonviolent bipolar symptoms and a concern by his treating doctor that his agitation would worsen his deteriorated medical condition.
*185 Thus, we cannot agree with the majority’s characterization of the appellants’ evidence as being replete with examples of threats and physical acts of violence. The lack of evidence of any specific assaultive or violent conduct over a five-to-six-year period in which the respondent was not continuously medicated is significant to the question of the respondent’s present dangerousness, unlike the lack of evidence of violent conduct in Matter of George L. during the relevant 17-month period in which George L. was “tranquilized” (Matter of George L., 85 NY2d at 307). Moreover, while the respondent’s underlying crime was undoubtedly extremely violent, it was committed 19 years prior to the hearing, and behavior of that nature was never repeated, even during the respondent’s period of confinement in a nonsecure facility or during his release into the community.
As to the remainder of the respondent’s behaviors while confined, it cannot be said that they indicate present dangerousness for purposes of confinement to a secure facility. As established by the record and as amply recited in the majority opinion, the respondent’s mental illness manifests itself in excessive and overzealous litigiousness, annoying behaviors, verbal abuse, and socially offensive behavior such as use of racial or ethnic epithets. This conduct does not demonstrate that the respondent poses a physical threat to others.
Indeed, when specifically asked at the hearing why they believed that the respondent was a physical danger to himself or others, the appellants’ experts, Simon-Phelan and Formica, only speculated that the respondent might harm Susan, and concluded that he was a danger to himself because he provoked other patients. Unlike a patient who, for example, is suicidal or prone to self-mutilation, the respondent’s provocation of other patients does not show that he is a physical danger to himself. A concern that the respondent might anger and be hurt by other people simply does not justify “the significant limitations on [the respondent’s] liberty interest which accompany secure confinement” (Matter of George L., 85 NY2d at 308).
As to Simon-Phelan’s and Formica’s belief that the respondent would harm Susan, the Court of Appeals has made clear that “a finding that a defendant ‘currently constitutes a physical danger to himself or others’ must be based on more than expert speculation that he or she poses a risk of relapse or reverting to violent behavior once medical treatment and supervision are discontinued” (id. at 307-308, quoting CPL *186 330.20 [1] [c]). Although the respondent violated the order of protection issued in Susan’s favor during his period of release into the community, he did not engage in any violent or threatening behavior toward her. In fact, he limited his contact with her to the telephone. The forensic psychiatric reports offered by the appellants do not contain evidence that the respondent expressed or harbored any intent to physically harm Susan. There is simply no reason to conclude, based upon the respondent’s specific circumstances, including his conduct during the 19 years since the underlying offense, that the respondent’s behavior with respect to Susan would escalate, or that the respondent, who is now 74 years old and, according to the appellants’ proof, in poor physical health, would be a physical danger to her, if transferred to a nonsecure facility. Thus, any such conclusion would be mere speculation.
Accordingly, without considering the respondent’s evidence, we conclude as a matter of law that the appellants failed to make a prima facie showing that the respondent “currently constitutes a physical danger to himself or others” (CPL 330.20 [1] [c]), thus requiring confinement in a secure facility (cf. Matter of Francis S., 87 NY2d at 561; Matter of George L., 85 NY2d at 308; Matter of Rabinowitz v James M., 50 AD3d 451, 452 [defendant properly found to have a “ ‘dangerous mental disorder’ ” where the defendant made threats of violence against staff members and patients of the facility, engaged in physical acts of violence, refused to participate in treatment, and was accused of forced sexual contact upon a fellow patient (quoting CPL 330.20 [1] [c])]; Matter of Carpinello v Floyd A., 23 AD3d 179 [2005] [defendant properly retained in a secure facility where, inter alia, while confined, he was involved in 15 violent incidents]; Matter of John P., 265 AD2d 559, 559 [1999] [petitioner showed that patient posed a substantial threat of physical harm to himself or others where evidence demonstrated that patient had “serious difficulty maintaining control of his rage and anger, and that he was frequently violent and verbally abusive”]).
Instead, contrary to the Supreme Court’s conclusion, the evidence demonstrated that the respondent exhibited the minimum level of dangerousness to himself or others required to retain him in a nonsecure facility. In this respect, the opinions of the appellants’ experts, the respondent’s history, including the underlying offense, diagnoses of bipolar disorder since the early 1990s, and his documented behaviors while confined, as well as the respondent’s refusal to take medication and denial *187 of any mental illness, demonstrate that the respondent is still in need of inpatient psychiatric care and that he is unable to understand the need for such treatment. The opinions of the respondent’s experts — that he suffered from a single episode of depression at the time of the offense against Susan but was not otherwise mentally ill and did not require treatment — were not credible. Those opinions were belied by numerous psychiatric evaluations of the respondent performed by different psychiatrists and psychologists through the years, many of whom opined that the respondent suffered from bipolar disorder, and by the respondent’s conduct while confined. That conduct and the respondent’s history amply demonstrated that the respondent was not yet prepared to function in the community (see Matter of Zheng Z., 78 AD3d 720, 721 [2010]; Matter of Jerriell O., 288 AD2d 313, 314 [2001]).
We further note that, because the respondent was initially classified as having a “dangerous mental disorder,” he would continue to be subject to the procedural restrictions in CPL 330.20 even upon his transfer to a nonsecure facility (see Matter of Jamie R. v Consilvio, 6 NY3d at 143; Matter of Norman D., 3 NY3d 150, 152 [2004]; Matter of Michael RR. [Commissioner of Mental Health], 233 AD2d 30, 34 [1997]). Thus, a court order would be required, for example, for any off-ground furlough, release, or discharge, and the District Attorney’s Office would be notified of any further court proceedings, with the option of participating (see CPL 330.20 [10], [12], [13]; Matter of Jamie R. v Consilvio, 6 NY3d at 143; Matter of Norman D., 3 NY3d at 154-155).
Accordingly, we would reverse the order and remit the matter for a finding that the respondent is “[m]entally ill” (CPL 330.20 [1] [d]), and for the issuance of a subsequent retention order and, pursuant to CPL 330.20 (11), a transfer order and an order of conditions.
Rivera, J.P, and Hinds-Radix, J., concur with Chambers, J.; Skelos J., concurs in part and dissents in part in a separate opinion in which Austin, J., concurs.
Ordered that the order is reversed, on the facts, without costs or disbursements, the application for the continued retention of the respondent is granted, and the matter is remitted to the Supreme Court, Orange County, for the issuance of a continued retention order in accordance with CPL 330.20 (9).

 “Mental illness” is defined in the Mental Hygiene Law as “an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation” (Mental Hygiene Law § 1.03 [20]).