[844 NE2d 285, 810 NYS2d 738]

In the Matter of JAMIE R., Appellant, v EILEEN CONSILVIO, as Director of Kirby Forensic Psychiatric Center, Respondent.

Argued January 5, 2006; decided February 9, 2006

**POINTS OF COUNSEL**

*Mental Hygiene Legal Service,* New York City (*Stephen J. Harkavy, Karen G. Andreasian* and *Diane G. Temkin* of counsel), for appellant. I. The Appellate Division erred by holding that there is no jury rehearing and review of a recommitment proceeding where the Legislature expressly provided for a jury rehearing and review of a recommitment proceeding and where it is required by state and federal constitutional standards. (*Matter of Dutchess County Dept. of Social Servs. v Day,* 96 NY2d 149; *Cohen v Anne C.,* 301 AD2d 446; *Matter of Wolpoff v Cuomo,* 80 NY2d 70; *Cohen v State of New York,* 94 NY2d 1; *Mental Hygiene Legal Servs. v Ford,* 92 NY2d 500; *Mathews v Eldridge,* 424 US 319; *Sandin v Conner,* 515 US 472; *Foucha v Louisiana,* 504 US 71; *Jackson v Indiana,* 406 US 715; *Matter of Kesselbrenner v Anonymous,* 33 NY2d 161.) II. The Appellate Division erred by holding that an insanity acquittee may take only a direct appeal of a recommitment order, and may not choose a jury rehearing and review of a recommitment order, when the Legislature expressly provided for either a direct appeal or a rehearing and review of a recommitment order. (*Matter of Norman D.,* 3 NY3d 150; *Matter of Coates,* 9 NY2d 242.) III. Where a dangerous mental disorder is an issue to be tried in

a jury rehearing and review, that issue is for the jury, not the judge. (*Francis S. v Stone,* 221 F3d 100; *Matter of David B.,* 97 NY2d 267; *Motor Veh. Mfrs. Assn. of U.S. v State of New York,* 75 NY2d 175; *Hudson View II Assoc. v Gooden,* 222 AD2d 163; *Sporza v German Sav. Bank,* 192 NY 8; *Matter of Watkins R. v Berry,* 276 AD2d 492; *Matter of Barber v Rochester Psychiatric Ctr.,* 250 AD2d 87; *Emmerich v Thorley,* 35 App Div 452; *Matter of Robert C. v Wack,* 167 Misc 2d 677; *Matter of Maureen A. v Wack,* 153 Misc 2d 600.) IV. The standard of appellate review of a jury rehearing and review of a recommitment order is the jury trial standard of review.

*Eliot Spitzer, Attorney General,* New York City (*Julie Loughran, Caitlin J. Halligan, Daniel Smirlock* and *Robert H. Easton* of counsel), for respondent. I. The Appellate Division correctly concluded that dangerous mental disorder is not an issue for determination on rehearing and review. (*Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *Matter of Auerbach v Board of Educ. of City School Dist. of City of N.Y.,* 86 NY2d 198; *Matter of Norman D.,* 3 NY3d 150; *Matter of David B.,* 97 NY2d 267; *Riley v County of Broome,* 95 NY2d 455; *Mental Hygiene Legal Servs. v Ford,* 92 NY2d 500; *Matter of 1605 Book Ctr. v Tax Appeals Trib. of State of N.Y.,* 83 NY2d 240; *Matter of Washington Post Co. v New York State Ins. Dept.,* 61 NY2d 557; *Cohen v Anne C.,* 301 AD2d 446; *Matter of Richard H. v Consilvio,* 6 AD3d 7.) II. There is no constitutional or statutory requirement that a jury determine whether an insanity acquittee has a dangerous mental disorder that required secure hospitalization. (*People v Lally,* 19 NY2d 27; *Mental Hygiene Legal Servs. v Ford,* 92 NY2d 500; *Morrissey v Brewer,* 408 US 471; *Matter of Coates,* 9 NY2d 242; *Mathews v Eldridge,* 424 US 319; *Matter of Consilvio v Michael B.,* 307 AD2d 852; *Matter of John K. v Consilvio,* 9 AD3d 256, 3 NY3d 737; *People ex rel. Brown v Johnston,* 9 NY2d 482; *McGraw v Wack,* 220 AD2d 291; *Matter of Norman D.,* 3 NY3d 150.) III. In any event, the First Department applied the correct standard of review, and its reversal on the facts should be affirmed. (*Northern Westchester Professional Park Assoc. v Town of Bedford,* 60 NY2d 492; *Matter of James M. v Consilvio,* 6 AD3d 153; *Lolik v Big V Supermarkets,* 86 NY2d 744.)

### OPINION OF THE COURT

GRAFFEO, J.

CPL 330.20 affords criminal defendants who have been found

not responsible by reason of mental disease or defect (insanity acquittees) and confined for inpatient psychiatric treatment the right to request a second trial-level proceeding—known as rehearing and review—to challenge the judicial determination authorizing confinement. We recently addressed the scope of the issues reviewable in a rehearing and review proceeding in *Matter of Norman D.* (3 NY3d 150 [2004]), holding that an insanity acquittee classified as a track one patient by virtue of a finding that he suffered from a dangerous mental disorder could not obtain review of that classification in a rehearing and review proceeding. In this case, the issue is whether an insanity acquittee found to suffer from a dangerous mental disorder and consequently placed in a secure facility can challenge that placement decision a second time on rehearing and review. Consistent with our holding in *Norman D.*, we conclude that he cannot because the only issue that may be resolved in a rehearing and review proceeding is the fundamental liberty question of whether any confinement by the Office of Mental Health is warranted. Instead of seeking rehearing and review, a patient seeking to challenge secure placement should pursue an appeal.

## The CPL 330.20 Scheme

Enacted in 1980, CPL 330.20 governs the procedure to be followed after a criminal court has entered a judgment that defendant is not responsible by reason of mental disease or defect.[1] Soon after the entry of judgment in the criminal case,[2] an initial commitment hearing is conducted to determine the

---

1. In its present form, CPL 330.20 was largely the result of a study conducted by the Law Revision Commission entitled "The Defense of Insanity in New York State" (1980 Report of NY Law Rev Commn, reprinted in 1981 McKinney's Session Laws of NY, at 2251-2293), which advocated reform of the system for handling individuals found not guilty by reason of insanity "to ensure public safety and to safeguard the rights of the mentally disabled offender" (*id.* at 2251). In 1980, the prior version of CPL 330.20 was repealed and the current statute now substantially follows the recommendations of the Law Revision Commission (*see* L 1980, ch 548, § 11).

2. In the criminal proceeding, the defense of not responsible by reason of mental disease or defect is an affirmative defense, meaning that defendant raises the issue and bears the burden of proof under the preponderance of the evidence standard (*see* Penal Law § 25.00 [2]; § 40.15). By securing a judgment of not responsible, defendant avoids criminal penalties and, instead, becomes subject to the CPL 330.20 scheme. This places insanity acquittees in a significantly different posture than involuntarily committed civil patients. As the Law Revision Commission drafters of CPL 330.20 explained, "rational differences between procedures for commitment and release applicable to defendants found not responsible and persons involuntarily committed under the Mental Hygiene Law are justifiable . . . on the ground that an acquitted

degree of confinement and/or supervision necessary to treat the insanity acquittee's condition and to safeguard both the acquittee and the public. As a result of this hearing, a defendant is placed in one of three procedural courses or "tracks."[3] The nature and extent of an insanity acquittee's confinement or supervision is determined by the track designation corresponding to the patient's mental condition.

> "The applicable tracks are premised upon findings either (i) that the defendant has a 'dangerous mental disorder' [track one]; or (ii) that the defendant does not have a dangerous mental disorder but is 'mentally ill' [track two]; or (iii) that the defendant does not have a dangerous mental disorder and is not mentally ill [track three]" (*Norman D.*, 3 NY3d at 153 n 1, quoting *People v Stone*, 73 NY2d 296, 300 [1989]).

Those patients who suffer from a "dangerous mental disorder" as that term is defined in CPL 330.20 (1) (c)[4] are classified as track one patients and confined in secure facilities operated by the Office of Mental Health (OMH). Those who are "mentally

defendant, himself, has asserted that his criminal conduct was the result of a mental disease or defect" (1980 Report at 2264). In this regard, "equal protection principles do not prevent different treatment of insanity acquittees from other persons subject to civil commitment because acquittees may validly be regarded as a separate class" (*see Matter of Francis S.*, 87 NY2d 554, 563 [1995]; *Matter of George L.*, 85 NY2d 295, 305 n 3 [1995]; *see generally, People v Escobar*, 61 NY2d 431, 440 [1984] [holding that the dictum in *Matter of Torsney* (47 NY2d 667 [1979]) suggesting that insanity acquittees must be afforded the same rights as civil patients is "no longer viable"]; *Jones v United States*, 463 US 354 [1983]).

3.  The "track" nomenclature does not appear in CPL 330.20 but is derived from the Law Revision Commission report that accompanied the proposed legislation, which states that "[t]he post-verdict scheme of proposed CPL 330.20 provides for three alternative 'tracks' based upon the court's determination of the defendant's mental condition at the time of [the initial] hearing" (1980 Report at 2265).

4.  The "dangerous mental disorder" finding that justifies track one classification and placement in a secure facility is defined in CPL 330.20 (1) (c): "[d]angerous mental disorder" means: "(i) that a defendant currently suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others." The term "mental illness" as defined in Mental Hygiene Law § 1.03 (20) "means an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation."

ill" as that term is defined in CPL 330.20 (1) (d)[5] are classified as track two patients and confined in nonsecure facilities under an order of conditions. Individuals who meet neither definition are classified as track three patients and released from OMH custody, usually with an order of conditions. When an insanity acquittee is assigned a track designation after the initial hearing, that track governs the applicable procedure until the individual is either released or recommitted to a more restrictive track. Once track status is determined, future confinement of the individual is determined through periodic "retention" hearings that may result in retention orders authorizing OMH to continue to hold the patient in a secure or nonsecure facility.

The retention, conditional release or discharge of a track one patient is governed entirely by CPL 330.20; further retention, conditional release or discharge of a track two or three patient is governed by both CPL 330.20 and the Mental Hygiene Law (*see Matter of Jill ZZ.*, 83 NY2d 133 [1994] [track two patient remained under jurisdiction of CPL 330.20 for purposes of order of conditions but, in other respects, was subject to dictates of the Mental Hygiene Law]), unless the patient is later recommitted as a track one acquittee (found to have a "dangerous mental disorder") and brought under the exclusive umbrella of CPL 330.20 (*see e.g. Matter of Francis S.*, 87 NY2d 554 [1995] [recommitment proceeding involving patient who was initially a track two acquittee]). Thus, even a track one patient who improves sufficiently to be transferred to a nonsecure facility continues to be subject to the procedural restrictions in CPL 330.20 (*see Matter of George L.*, 85 NY2d 295, 301, 302 n 2 [1995]).

"Track status designation, unique to insanity acquittees, is vitally important in determining the level of judicial and prosecutorial involvement in future decisions about an acquittee's confinement, transfer and release" (*Norman D.*, 3 NY3d at 154). Track one patients are subject to far more comprehensive supervision by the courts than track two and three patients. For example, under CPL 330.20, "a court order is required for any transfer to a nonsecure facility, off-ground furlough, release or

---

5. The term "mentally ill," the finding that justifies placement in a nonsecure facility, is defined in CPL 330.20 (1) (d) and "means that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of [OMH], is essential to such defendant's welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment."

discharge [involving a track one patient]; and the district attorney's office continues to be notified of, with the option of participating in, further court proceedings involving the acquittee" (*id*. at 154-155). The same is not true of track two and three patients, whose treatment is primarily overseen by the Commissioner of OMH pursuant to the Mental Hygiene Law statutes and regulations pertaining to the care of involuntarily committed civil patients.

Against this backdrop of the applicable statutory and decisional law, we turn to the case before us.

## Facts

In 1998, petitioner Jamie R. was charged with assault for kicking a deputy sheriff in the groin while in custody on a probation violation.[6] While the charge was pending, he underwent a psychiatric screening to determine whether he was competent to assist with his defense and, for a period, was found to be incompetent based on a diagnosis of paranoid schizophrenia and antisocial personality disorder. Once deemed fit to proceed, he pleaded not responsible by reason of mental disease or defect under CPL 220.15, becoming an insanity acquittee subject to CPL 330.20 procedures.

At an initial commitment hearing in 1999, Dutchess County Court concluded that Jamie R. was suffering from a "mental illness" but did not have a "dangerous mental disorder" as those terms are defined in CPL 330.20. This determination resulted in his classification as a track two patient and placement at the Hudson River Psychiatric Center, a nonsecure facility operated by OMH. Jamie R. was twice discharged from that facility. After the first discharge, he briefly returned home to live with his mother but was readmitted to the facility six days after his release due to disruptive and threatening behavior that included a physical altercation with some neighbors and a threat to kill his mother. His second discharge involved placement in a community residence but he was evicted from that program for

6. Jamie R. was serving a five-year sentence of probation as a result of a 1997 conviction for assault in the second degree, a class D felony. It appears from the record that this conviction also involved an assault on a police officer. He was in police custody for violations of probation, including being discharged from his psychiatric treatment program due to disruptive behavior and a failure to attend programs or to comply with treatment orders, threatening remarks to another person, operating a vehicle without a license and consuming alcohol in violation of his conditions of probation.

abusive and disruptive behavior, including throwing a chair at a female resident. After he was rehospitalized in October 2002, he allegedly assaulted another patient who was suffering from multiple sclerosis.

In addition to these incidents and during the same time frame, Jamie R. was arrested several times for incidents occurring when he was off facility premises. The first in this series of arrests occurred in March 2002 when, as a result of a motor vehicle stop, he was charged with driving while ability impaired and unlicensed operation of a motor vehicle. A few weeks later, while on a visit to his mother's home, he was charged with assaulting his girlfriend. In the months following the assault arrest, he was charged with criminal contempt in the second degree and aggravated harassment in the second degree stemming from numerous harassing and threatening telephone calls to his girlfriend.

Jamie R.'s difficulties both inside and outside the nonsecure psychiatric treatment facility led the Commissioner of OMH to file a recommitment application in 2002 seeking to have Jamie R. reclassified as a track one patient and placed in a secure facility.[7] OMH concluded that Jamie R.'s disruptive and threatening behavior required the higher level of security offered in such a facility, which is "staffed with personnel adequately trained in security methods and . . . so equipped as to minimize the risk or danger of escapes" (CPL 330.20 [1] [b]). In order to obtain reclassification, the Commissioner was required to prove to the satisfaction of the court that Jamie R. suffered at that time from a "[d]angerous mental disorder," meaning that he was mentally ill, requiring inpatient care and treatment, and "constitute[d] a physical danger to himself or others" (CPL 330.20 [1] [c]). This is the same showing that must be made to obtain track one classification in an initial commitment proceeding.

---

7. The recommitment application was filed in April 2002 but the recommitment proceeding was not conducted until October 2003. During that period, Jamie R. was given another chance to remain in a nonsecure facility by OMH obtaining a six-month civil retention order pursuant to Mental Hygiene Law § 9.33 (although other aspects of treatment of track two patients remain under the purview of CPL 330.20, retention of track two patients is governed by the Mental Hygiene Law provisions addressing involuntary commitment of civil patients). Jamie R. was confined under that order at Hudson River Psychiatric Center, a nonsecure facility. After the six-month period elapsed, OMH pursued the recommitment application for placement in a secure facility.

Dutchess County Supreme Court conducted a three-day hearing on the application, concluding that Jamie R. suffered from a dangerous mental disorder necessitating track one reclassification and retention in a secure facility. Jamie R. did not seek leave to appeal the recommitment order. Rather, in November 2003, he filed a petition for jury rehearing and review pursuant to CPL 330.20 (16) and Mental Hygiene Law § 9.35.

A second hearing, known as rehearing and review, was held before a jury in New York County Supreme Court. The Commissioner submitted relevant medical records and presented the testimony of two psychiatrists, who detailed Jamie R.'s psychiatric history covering more than 20 prior hospitalizations beginning when he was nine years old. They also discussed his criminal history, which included a prior felony assault conviction in addition to the assault offense giving rise to his status as an insanity acquittee, and more than 17 arrests for offenses such as assault, harassment and criminal possession of a weapon. These periodic brushes with the law began when Jamie R. was 16 years old and continued until his recommitment, notwithstanding that he spent considerable time in treatment facilities or under the outpatient supervision of psychiatric professionals.

Both psychiatrists opined that Jamie R. suffered from a dangerous mental disorder requiring inpatient treatment in a secure facility. Dr. Malavade diagnosed him as suffering from antisocial personality disorder marked by longstanding problems with impulsivity and aggression. He found that placement in a secure facility was warranted because Jamie R.'s extensive history of abusive and threatening behavior demonstrated that he was at a high risk for violence. He was particularly troubled by the fact that Jamie R. had limited-to-no insight concerning his mental illness and lacked remorse for past misconduct, suggesting an inability or unwillingness to control his pattern of abusive behavior.

Dr. Siegel similarly testified that Jamie R. suffered from antisocial personality disorder, impulse control disorder, and psychopathy, meaning that he did not empathize with others and did not appreciate that his abusive or threatening conduct was harmful to others. He noted that Jamie R. lacked remorse for his prior transgressions and did not take responsibility for them, but instead characterized himself as a victim, contending that his prior conflicts all occurred because he was being picked on or treated unfairly by the others involved. Dr. Siegel concluded that these factors, coupled with a failure to appreci-

ate the nature of his illness, placed Jamie R. at a high risk for further violent and abusive behavior.

Jamie R. did not present any expert proof contradicting the psychological assessments of the Commissioner's witnesses. But he did testify on his own behalf, asserting that he did not suffer from a mental illness and, in any event, did not require inpatient treatment. Jamie R.'s mother also testified, urging the jury to release her son from OMH custody and allow him to return home to live with her.

The jury found that Jamie R. suffered from a mental illness necessitating inpatient treatment but did not "currently constitute a physical danger to himself or others." Treating the latter conclusion as an advisory verdict on the dangerous mental disorder issue, New York County Supreme Court nonetheless agreed with the jury's conclusion and entered a judgment determining that Jamie R. was mentally ill requiring retention in OMH custody but did not suffer from a dangerous mental disorder necessitating placement in a secure facility.

In the first order, New York County Supreme Court did not disturb Dutchess County Supreme Court's recommitment order but instead directed that Jamie R. be transferred to a nonsecure facility. Jamie R. then moved to resettle the order, arguing that the finding that he could be retained pursuant to the recommitment order was inconsistent with the finding that he must be transferred to a nonsecure facility because, by definition, a CPL 330.20 recommitment order reflects a determination that the acquittee suffers from a dangerous mental disorder requiring secure placement. New York County Supreme Court granted the motion and issued a resettled order denying the Commissioner's recommitment application and further directing that Jamie R. be placed in a nonsecure facility.

On the Commissioner's appeal, the Appellate Division reversed and reinstated Dutchess County Supreme Court's recommitment order. The Court concluded that New York County Supreme Court had erred in revisiting the earlier determination that Jamie R. suffered from a dangerous mental disorder because such a determination may be challenged only in an appeal to the Appellate Division. Interpreting the language in CPL 330.20 (16) and Mental Hygiene Law § 9.35—the statutes authorizing rehearing and review—the Court held that such a proceeding allows a jury (or a court, if the patient waives a jury) to address whether a patient suffers from a mental illness

requiring inpatient care, but does not authorize a jury to consider the dangerous mental disorder question and thereby decide what type of facility should treat the patient. As an alternative holding, the Court concluded that, even if the dangerous mental disorder determination had been reviewable on rehearing and review, New York County Supreme Court's determination that Jamie R. did not suffer from a dangerous mental disorder was not supported by any fair interpretation of the evidence given the overwhelming proof that secure placement was warranted. We granted Jamie R. leave to appeal and we now affirm.

## Analysis

On appeal to this Court, Jamie R. no longer asserts (as he did at the rehearing and review proceeding) that he is entitled to be released from OMH custody. Rather, he objects to his placement in a secure facility, contending that the dangerous mental disorder issue was properly submitted to the jury in the rehearing and review proceeding and that the jury finding that he does not suffer from a dangerous mental disorder should be given effect. In other words, Jamie R. seeks transfer to a nonsecure facility.

OMH counters that rehearing and review—a procedure borrowed from the civil commitment statutory scheme—is limited to giving the patient a second chance at the trial level to object to confinement in OMH custody, allowing relitigation of that issue before a jury. OMH argues that placement questions, including the proper facility in which to treat a patient, are beyond the scope of rehearing and review.

Under CPL 330.20, an insanity acquittee dissatisfied with a commitment, recommitment or retention determination has two avenues of redress: a permissive appeal under CPL 330.20 (21)[8] or a rehearing and review proceeding under CPL 330.20 (16). CPL 330.20 (21) contains an election of remedies provision that requires the patient to choose between these two procedural routes.

Here, Jamie R. selected rehearing and review. CPL 330.20 (16) provides:

---

**8.** It is undisputed that an insanity acquittee can obtain review of the dangerous mental disorder determination underlying track one classification and placement in a secure facility in an appeal from a commitment, recommitment or retention order.

"[a]ny defendant who is in the custody of the commissioner pursuant to a commitment order, a retention order, or a recommitment order, if dissatisfied with such order, may, within thirty days after the making of such order, obtain a rehearing and review of the proceedings and of such order in accordance with the provisions of section 9.35 or 15.35 of the mental hygiene law."

Mental Hygiene Law §§ 9.35 and 15.35 are part of the statutory scheme governing the involuntary commitment of civil patients, the former covering mentally ill patients and the latter addressing mentally retarded/developmentally disabled patients. In virtually identical terms, each statute grants civil patients a right to rehearing and review of certain civil confinement orders. When a mentally ill patient requests rehearing and review, Mental Hygiene Law § 9.35 directs that the court "shall cause a jury to be summoned and shall try the question of the mental illness and the need for retention of the patient so authorized to be retained." The statute further allows a patient to "waive the trial of the fact by a jury and consent in writing to trial of such fact by the court" (Mental Hygiene Law § 9.35). Rehearing and review therefore provides a psychiatric patient a unique opportunity to relitigate certain confinement issues before a second trial-level court.

We interpreted these rehearing and review provisions in *Matter of Norman D.* (3 NY3d 150 [2004]), a case where an insanity acquittee sought to use the procedure to obtain review of an initial commitment order. By definition, whenever a court issues a commitment or recommitment order, it has found that the patient suffers from a dangerous mental disorder warranting placement in a secure facility and classification or reclassification as a track one acquittee (*see* CPL 330.20 [1] [f]; [6], [14]). That was the case with Norman D.—after a commitment proceeding, he was found to suffer from a dangerous mental disorder which carried with it track one classification and placement in a secure facility.

By the time Norman D.'s rehearing and review proceeding was conducted, his condition had improved to the extent that he no longer required treatment in a secure facility and OMH agreed to transfer him to a nonsecure facility. Seeking to challenge his continuing status as a track one patient, however, Norman D. persisted with the request for rehearing and review of the commitment order. Just as Jamie R. contends in this

case, Norman D. argued that the rehearing and review statutes authorize de novo review of every aspect of the order challenged. Since track one classification emanates by operation of law from a commitment determination, Norman D. claimed that track one classification could be revisited by the jury or court on rehearing and review.

This Court rejected that argument, noting that "[r]ehearing and review is to be conducted in accordance with" Mental Hygiene Law § 9.35 (for mentally ill patients), a statute that restricts the issue addressed in such a proceeding to the factual "question of the mental [illness] and the need for retention of the [patient]" (*Norman D.*, 3 NY3d at 155, quoting Mental Hygiene Law § 9.35). This rehearing and review provision makes no reference to the patient being a "physical danger to himself or others" and therefore does not encompass the dangerous mental disorder determination that justifies track one classification and placement in a secure facility.

Thus, we held in *Norman D.* that a patient can challenge a track one classification on appeal but not in a rehearing and review proceeding. As to the latter, we clarified that a rehearing and review is a "de novo evidentiary proceeding, with the findings a snapshot of the acquittee's condition at that moment" (*id.*). It provides an avenue for the patient to challenge "the conditions of supervision originally imposed," thereby allowing review of whether the insanity acquittee requires inpatient treatment or is able to be safely released in the community and supervised as an outpatient under an order of conditions (*id.* at 155-156). Simply put, rehearing and review allows a patient to place before the jury the basic liberty issue of whether he or she should be confined in OMH custody.

Jamie R. attempts to avoid the impact of our decision in *Norman D.* by drawing a distinction between track one classification and the underlying dangerous mental disorder determination authorizing placement in a secure facility. Recognizing that *Norman D.* precludes rehearing and review of the former, he nonetheless maintains that Mental Hygiene Law § 9.35 authorizes reconsideration of the latter. In addition to the fact that dangerous mental disorder review falls outside the defining language in section 9.35, this argument must be rejected based on other aspects of our analysis in *Norman D.*

Our conclusion that review of Norman D.'s track one classification was not within the purview of Mental Hygiene Law

§ 9.35 was premised, in part, on the observation that track status involves "a determination that is unique to individuals who have committed criminal acts and inapplicable to involuntary civil patients" (3 NY3d at 157). As a result, its inclusion in the civil rehearing and review procedure incorporated by reference in CPL 330.20 (16) could not have been contemplated by the Legislature. Since track one classification turns entirely on a dangerous mental disorder determination, and dangerous mental disorder is also a concept unique to criminal acquittees, we fail to see how our decision in *Norman D.* permits an analytical distinction between the two in the context of rehearing and review.[9] If the dangerous mental disorder determination is not reviewable on rehearing and review for purposes of revisiting track status as we held in *Norman D.*, it follows that it is not reviewable on rehearing and review for purposes of revisiting the secure versus nonsecure placement question.[10]

The logic of this conclusion is apparent, particularly when viewed in the broader context of CPL 330.20. Although the statute authorizes courts supervising insanity acquittees to issue many types of orders, such as transfer orders, furlough orders

---

**9.** In fact, although Jamie R. seeks reinstatement of New York County Supreme Court's resettled order, he fails to acknowledge that the court made no such distinction (which is understandable given that these proceedings preceded our decision in *Norman D.*). By denying OMH's recommitment application, the court effectively vacated Dutchess County Supreme Court's recommitment order and overruled Jamie R.'s track one reclassification. This was the very result we held to be beyond the scope of rehearing and review in *Norman D.*

**10.** It makes no difference that New York County Supreme Court only submitted the issue to the jury for purposes of obtaining an advisory verdict, reserving to itself the ultimate decision on dangerous mental disorder, a procedure suggested in several appellate cases (*see e.g. Matter of Watkins R. v Rosenwasser*, 4 AD3d 431 [2d Dept 2004]; *Matter of James M. v Consilvio*, 6 AD3d 153 [1st Dept 2004]). In fact, both parties in this case agree that the advisory verdict approach is not consistent with the statutory scheme, framing the issue as whether dangerous mental disorder is reviewable by either a judge or a jury on rehearing and review of a recommitment order. That question can be answered only by reference to the pertinent statutory language— which, as we concluded in *Norman D.*, appears in Mental Hygiene Law § 9.35. Whether decided by a jury or a judge, that provision limits the issues that may be addressed on rehearing and review to mental illness and the need for inpatient treatment. Moreover, under section 9.35, the decision whether to have a jury resolve the pertinent issues is vested in the patient, not the court. Here, Jamie R.'s counsel did not waive his right to jury review. As such, even if the dangerous mental disorder finding had been reviewable on rehearing and review, there was no statutory basis for New York County Supreme Court to treat the verdict on that issue as advisory rather than binding. Therefore, the cases giving an advisory role to the jury should not be followed.

and orders of conditions, the right to rehearing and review was extended to only three: commitment, recommitment and retention orders (*see* CPL 330.20 [16]). The other orders excluded from rehearing and review relate not to the liberty question of whether inpatient treatment is warranted but to specific aspects of patient treatment,[11] suggesting that the Legislature did not contemplate a jury (or a court, if a jury is waived) to revisit those types of issues on rehearing and review.

In contrast, the three types of orders for which rehearing and review is authorized all address the fundamental question of whether a patient can be confined in OMH custody. In order to obtain a retention order, OMH must establish at a minimum that an insanity acquittee is "mentally ill" (which, by definition, means the patient suffers from a mental illness and needs inpatient treatment), but a retention order can be obtained without a showing that the patient suffers from a dangerous mental disorder (*see* CPL 330.20 [8]).[12] To obtain a commitment or recommitment order, OMH must prove not only the threshold question of mental illness and the need for retention but also that the insanity acquittee suffers from a dangerous mental disorder under the heightened dangerousness standard.

Thus, the element common to all retention, commitment and recommitment orders is the basic liberty issue of whether a

---

**11.** A "[f]urlough order" directs the Commissioner of OMH "to allow a defendant in confinement pursuant to a commitment order, recommitment order or retention order to temporarily leave the facility for a period not exceeding fourteen days, either with or without the constant supervision of one or more employees of the facility" (CPL 330.20 [1] [k]). A "[t]ransfer order" authorizes transfer of a defendant from a secure to a nonsecure facility (CPL 330.20 [1] [*l*]). An "[o]rder of conditions" is "an order directing a defendant to comply with this prescribed treatment plan, or any other condition which the court determines to be reasonably necessary or appropriate, and, in addition, where a defendant is in custody of the commissioner, not to leave the facility without authorization" (CPL 330.20 [1] [o]). Where appropriate, such an order can also require a defendant to refrain from harassing any victims or witnesses of the underlying criminal offense, or stay away from their homes, schools or businesses (*id.*).

**12.** As we explained in *Matter of David B.* (97 NY2d 267 [2002]), this threshold standard encompasses a showing that the patient is dangerous, although the concept of danger necessary to justify confinement in a nonsecure facility is not equivalent to the heightened dangerousness finding—dangerous mental disorder—that justifies placement in a secure facility. With respect to the "constitutionally required minimum level of dangerousness to oneself or others that must be shown before an insanity acquittee may be retained in a non-secure facility" (*id.* at 276), "dangerousness is not coterminous with violence" (*id.* at 278) but is part of the finding that inpatient care is essential to the patient's physical or psychological well-being.

patient should be held in OMH custody—the very issue identified in Mental Hygiene Law § 9.35 as the subject of rehearing and review. By extending rehearing and review to these types of CPL 330.20 orders but not others, the Legislature clearly intended to provide insanity acquittees a second chance to obtain release from OMH custody in the event of an erroneous deprivation of liberty, while avoiding duplicate litigation in the form of de novo review of less fundamental placement/treatment decisions. This result is consistent with the Legislature's broader intent when it enacted the current version of CPL 330.20 "to strike a balance between public safety and the individual rights of the acquittee" (*Norman D.*, 3 NY3d at 154).

As this Court concluded in *Mental Hygiene Legal Servs. v Ford* (92 NY2d 500, 508 [1998], quoting *Savastano v Nurnberg*, 77 NY2d 300, 308 [1990]), a case in which an involuntarily committed civil patient unsuccessfully challenged the constitutional validity of OMH's administrative transfer procedure, the decision to treat a patient in a secure as opposed to a nonsecure facility "reflects primarily a *medical* judgment about the kind of facility that would best serve the patient's therapeutic needs." This is particularly true "in the case of a violent mentally ill patient, [since] security concerns are inextricably linked to considerations of professional medical treatment" (*id.* at 509). Such treatment concerns fall outside the ambit of the limited question of "mental illness and the need for retention" at issue in a rehearing and review proceeding under Mental Hygiene Law § 9.35.

At its core, Jamie R.'s claim is that he should be able to challenge on rehearing and review Dutchess County Supreme Court's decision to authorize his transfer from a nonsecure to a secure facility. But involuntarily committed civil patients transferred from a nonsecure to a secure facility under OMH's administrative transfer procedure (*see* Mental Hygiene Law § 29.11 [a]; 14 NYCRR 57.2) are not entitled to rehearing and review of the propriety of that placement determination. We explained in *Norman D.* that, by referencing Mental Hygiene Law § 9.35, the Legislature intended to provide insanity acquittees "rehearing and review rights comparable to [those of] civilly committed patients" (*Norman D.*, 3 NY3d at 156). If we were to recognize a right to rehearing and review of what is essentially a transfer decision, we would be granting to insanity acquittees a broader procedural right not generally available to civil patients. We see no evidence in this statutory scheme that such a consequence was intended by the Legislature.

Finally, we note that our conclusion does not shield the dangerous mental disorder determination from a second level of judicial scrutiny since the issue is reviewable in an appeal to the Appellate Division under CPL 330.20 (16). Moreover, even in the absence of an appeal, insanity acquittees are entitled to frequent judicial review of placement decisions emanating from commitment or recommitment orders because they expire after six months (*see* CPL 330.20 [1] [f]), at which point the propriety of confinement is reviewed at periodic retention hearings where OMH must prove to the satisfaction of the court that the patient currently suffers from a dangerous mental disorder warranting continued placement in a secure facility (*see* CPL 330.20 [8]).

Accordingly, the order of the Appellate Division should be affirmed, without costs.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSENBLATT, READ and R.S. SMITH concur.

Order affirmed, without costs.