[818 NYS2d 710]

In the Matter of Sharone T., Respondent. Rochester Psychiatric Center, Appellant. (Appeal No. 1.)

Fourth Department, July 7, 2006

### APPEARANCES OF COUNSEL

*Eliot Spitzer, Attorney General*, Albany (*Julie S. Mereson* of counsel), for appellant.

*Emmett J. Creahan, Director, Mental Hygiene Legal Service*, Rochester (*Dana M. Ragsdale* of counsel), for respondent.

### OPINION OF THE COURT

PINE, J.

## I

In February 2003 petitioner, hereafter referred to as defendant (*see* CPL 330.20) was found not guilty by reason of mental disease or defect of criminal charges of assault in the second degree and resisting arrest (*see* Penal Law § 40.15) and was thereafter found to suffer from a "dangerous mental disorder" (CPL 330.20 [1] [c]), resulting in classification as a track one patient under the scheme set forth in CPL 330.20. He was committed to the Forensic Unit at Rochester Psychiatric Center (RPC), a secure unit in a facility under the jurisdiction of the New York State Office of Mental Health (OMH), and has been retained there since that time. Although defendant has not taken appeals from the original commitment order or either of two subsequent retention orders, which continued him in custody at RPC or another suitable secure facility on the ground that he still had a dangerous mental disorder under CPL 330.20 (1) (c), he sought a rehearing and review of his second retention order pursuant to CPL 330.20 (16), alleging in his petition that, inter alia, he is not mentally ill. The rehearing and review of a person alleged to be mentally ill was required to be conducted in accordance with the provisions of Mental Hygiene Law § 9.35 (*see* CPL 330.20 [16]). The proceedings were conducted on November 21 and 22, 2005 before a jury. Three questions were presented to the jury in a verdict sheet: (1) whether defendant

currently suffers from a mental illness; (2) if so, whether inpatient care and treatment at a hospital is essential to his welfare; and (3) if so, whether his judgment is so impaired that he is unable to understand the need for such care and treatment (*see* Mental Hygiene Law §§ 9.01, 9.35).

This Court granted the motion of RPC for leave to appeal from the order entered in appeal No. 1 that, based upon the jury verdict responding in the affirmative to questions (1) and (2) but in the negative to question (3), released defendant from RPC subject to specified conditions, and we stayed the order pending appeal. Supreme Court in effect determined that the jury's response to question (3) was inconsistent with the jury's responses to questions (1) and (2), i.e., the jury's finding that defendant has insight into his need for inpatient treatment did not support the jury's findings that defendant is "mentally ill" as that term is defined in CPL 330.20 (1) (d) and that inpatient care and treatment at RPC is essential to his welfare. This Court also granted the motion of RPC for leave to appeal from the order entered in appeal No. 2 that, inter alia, denied its motion for judgment notwithstanding the verdict or, alternatively, to set aside the verdict as against the weight of the evidence and for a new hearing.

## II

RPC contends on appeal that the court erred in basing its decision on the jury's response to the third question and instead should have ignored that response and granted judgment to RPC based on the jury's responses to the first two questions. RPC does not dispute that the reference to the ability to understand the need for such care and treatment is found in both Mental Hygiene Law § 9.01 and CPL 330.20 (1) (d), but contends that "the cases do not list the patient's understanding of his or her need for treatment as a separate consideration." RPC further contends that, when the jurors responded in the affirmative to the second question, finding that inpatient care and treatment as a patient at RPC is essential to the welfare of defendant,

> "they concluded that without inpatient ca[r]e he would pose a risk of danger to himself or others. In so doing, they presumably considered defendant's understanding of his need for treatment and whether he will likely relapse or continue to take his medication and seek treatment on an outpatient

basis. Accordingly, while the defendant's understanding of his need for care and treatment is considered, it is only one of the factors considered to determine whether inpatient care is essential to his welfare, and not a separate prerequisite for retention."

We agree with defendant that the "insight factor" addressed in question (3) is a necessary element to warrant retention in an OMH facility, inasmuch as it is included in both the definition of "mentally ill" in CPL 330.20 (1) (d) and the definition of "need for retention" as defined in Mental Hygiene Law §§ 9.01 and 9.35. We agree with RPC, however, that the verdict with respect to question (3) is against the weight of the evidence.

## III

The only expert to testify at the hearing was defendant's treating psychiatrist at RPC. He testified that he diagnosed defendant with "[s]chizophrenia, cannabis dependence, alcohol abuse, attention deficit/hyperactivity disorder, personality disorder that's not otherwise specified with antisocial traits and reading disorder and disorders of written expression." He explained that the schizophrenia included auditory and tactile hallucinations and paranoia, and he opined that, "based upon a reasonable degree of scientific certainty," defendant is suffering from a mental illness as defined in Mental Hygiene Law § 1.03.

Defendant's treating psychiatrist further testified that defendant understands that he has a mental illness, and that if he does not take his medications "he's much more likely to get into fights with people and that that causes him to get paranoid feeling and hear voices and get the tactile hallucinations." The psychiatrist testified that, although defendant is "making progress" with recognizing that "his anger problem is worse than most people," defendant nonetheless continues to minimize the significance of his mental illness and has no "insight into the need for the close monitoring and structure of the Forensic Unit." He opined that defendant continues to be dangerous because

"[h]e does not have an appreciation of his dangerousness to the degree which we would need to see. He has not really gone very far in his appreciation of dangerousness, other than the last four months, and he would need to show himself and us that he could be maintained in a less restrictive environ-

ment, for example, by going to the floor for more stable patients, eventually going and requesting furloughs, which is the next step that we do. To get patients out into the community we go through a series of steps . . . . [B]y petitioning in this manner, he's basically stating 'I feel I should skip all of those steps and just go out into the community,' and the treatment team and I feel he's not ready."

On cross-examination, defendant's treating psychiatrist admitted that defendant's psychosis improved after defendant began taking Clozapine, that defendant "was considered competent enough to stand trial" after he began taking the medication, and that defendant's tactile and auditory hallucinations were resolved by November 2003. The psychiatrist further testified that defendant has good insight into his need to take Clozapine, but that, even with the medication, he has stress-induced paranoia and sometimes must take additional medication. He acknowledged that defendant "has done a lot of work in learning what his warning signs are, and he's able to recognize his warning signs, and that's definitely a good thing." He also testified that defendant acknowledged that he had a problem with anger and has been discussing that problem more readily.

On redirect examination, the psychiatrist testified that, even in the "highly controlled environment [of the Forensic Unit] where he's monitored all the time, . . . he can become paranoid and impulsive[,] . . . [and] the significance of the impulsiveness being out of control within the last five months is very significant. It goes to dangerousness." He further testified that, although defendant's "insight into potential for future dangerousness was improving," the issue was "[a]bsolutely not" resolved to the psychiatrist's satisfaction. The psychiatrist further testified that the fact that defendant did not report his tactile hallucinations to anyone when he experienced them in July 2005 is "significant as to his dangerousness," and he concluded that defendant is "very early on" in the process of "being transferred to the civil side" before being placed in the community, where there would be no controls.

When asked on direct examination what he felt about "psychiatric treatment," defendant testified, "I think I still need it, but I want to be placed somewhere more normal. If I can have normal people around my ages because I am, like, the youngest one in the hospital in the Forensic [Unit], and it's kind of differ-

ent. It's tough being the youngest one." He testified that he would like to have psychiatric treatment, "just somewhere else. Do the same treatment, same treatment and everything, but a different place." He further testified, "I would be faithful in taking [my medication] because I know I need my medication for the symptoms, like tactile hallucinations. I will be dedicated to tak[ing] my medication, go to out-patient, everything I have to do to stay free, to come home and stay free." His preference was to return to his family, but if the court ordered him to live in some other kind of arrangement such as a group home, he would agree. He testified, "I would take it because I want to get out of the Forensic [Unit] because I don't think it's for me. It's too strict for me, and I don't think I deserve that. . . . Anywhere else, other than the place at [the] Forensic [Unit]. Anywhere else I wouldn't mind."

On cross-examination, defendant admitted that, on December 11, 2001, he threw a rock into a trooper's face after striking a police officer, the acts underlying the verdict of not guilty by reason of mental illness. Defendant explained that, when he testified that he did not deserve to be in the Forensic Unit, he meant that "I should deserve another chance at life, and I hope the jury, like, pray for me that I get better. I don't think I should be at the Forensic [Unit] because it's too strict, and I think I deserve a normal life." He testified, "I was sick at the time [of the December 11, 2001 incident]. I was having tactile." When asked, "You don't think you're sick now," he responded, "I am sick now."

## IV

We agree with RPC that the jury's response to question (3) is against the weight of the evidence. The jury's responses to the questions on the verdict sheet appear to be an impermissible attempt by the jury to have defendant retained as an involuntary patient but transferred from the Forensic Unit at RPC to a less restrictive unit. However, "the only issue that may be resolved in a rehearing and review proceeding is the fundamental liberty question of whether any confinement by the Office of Mental Health is warranted. Instead of seeking rehearing and review, a patient seeking to challenge secure placement should pursue an appeal" (*Matter of Jamie R. v Consilvio*, 6 NY3d 138, 141 [2006]). Thus, the proper procedural vehicle for a challenge by defendant to his placement in the secure Forensic Unit was an appeal from the second retention order; defendant's election to

pursue a rehearing and review forecloses a challenge by defendant to the issue of secure placement (*see Matter of Norman D.*, 3 NY3d 150, 155 [2004]). Based on the evidence presented to the jury, we conclude that the jury's response to question (3), that the judgment of defendant is not so impaired that he is unable to understand his need for "such care and treatment," i.e., the inpatient care and treatment at RPC to which question (2) refers, is against the weight of the evidence. In our view, as applied to the facts of this case, the phrase "such care and treatment" in the definition of "in need of involuntary care and treatment" in Mental Hygiene Law § 9.01 refers to inpatient treatment of defendant at RPC. The testimony of defendant and his treating psychiatrist both indicated that, while defendant has made progress, defendant does not understand the need for his continued inpatient treatment at RPC. As noted, the specific unit at RPC where defendant is treated is not at issue in this rehearing and review proceeding. We note, however, the potential for inconsistent responses on the three questions on the verdict sheet unless the jury is made aware of its limited role.

V

Accordingly, based on our conclusion that the jury's finding that defendant understands his need for such inpatient care and treatment is against the weight of the evidence, the order in appeal No. 1 should be reversed, RPC's motion to set aside the jury's verdict granted and the matter remitted to Supreme Court for a new hearing. Because the order in appeal No. 2 is subsumed in the order in appeal No. 1, RPC's appeal from the order in appeal No. 2 should be dismissed (*see Smith v Catholic Med. Ctr. of Brooklyn & Queens*, 155 AD2d 435 [1989]; *see also* CPLR 5501 [a] [1]).

Gorski, J.P., Martoche, Green and Hayes, JJ., concur.

It is hereby ordered that the order so appealed from be and the same hereby is unanimously reversed on the law without costs, respondent's motion is granted, the verdict is set aside and the matter is remitted to Supreme Court, Monroe County, for a new hearing.