OPINION OF THE COURT
Victor J. Alfieri, Jr., J.
This matter comes before this court by way of a notice of petition dated January 12, 2008 filed by defendant/petitioner Timothy Makas (hereinafter referred to as defendant), a patient at Mid-Hudson Forensic Psychiatric Center, the respondent (hereinafter referred to as Mid-Hudson or respondent). The relief sought by defendant in the petition is a rehearing and review, by a jury, of a decision and order dated December 12, 2008 by the Honorable Robert H. Freehill, Acting Justice of the Orange County Supreme Court.[1] The petition for rehearing and review was granted and the matter was assigned to this court for a hearing.[2] On January 27, January 29, February 11, March 4 and March 8, 2010, the hearing was held for this court to determine, on rehearing and review, whether, as previously determined by Justice Freehill, defendant suffers from a mental illness and needs to be retained. During the hearing before this court, the extent of the court’s review in such a proceeding was also raised and argued by both parties. Both of these issues will be discussed herein.
First, by way of background and as is relevant to this court’s decision, defendant pleaded guilty to arson in the second degree on November 20, 1998. On January 22, 1999, defendant was sentenced to an indeterminate term of 6 to 12 years in state prison. {See court exhibit 2, certificate of conviction.) Defendant appealed his conviction, which was reversed by the Appellate Division, Third Department (see People v Makas, 273 AD2d 510 [3d Dept 2000]), and, on December 27, 2000, entered a plea of not responsible by reason of mental disease or defect (CPL 220.15; see respondent’s exhibit C, report of Kostas A. Katsavdakis, Ph.D., PC., at 1). Thereafter, pursuant to CPL 330.20, *636 the defendant was committed to the custody of the Commissioner of Mental Health for confinement in a secure facility for a period of six months. Defendant’s placement and retention has been continued by mesne orders of various justices of this court. The most recent order, which is the subject of the within petition, extended defendant’s placement for a period not to exceed two years from the expiration of the last order. As two separate applications for retention were pending at the time the December 12, 2008 order was signed by Justice Freehill, the defendant’s retention was extended to October 12, 2010. (See decision and order dated Dec. 12, 2008 of Honorable Robert H. Freehill, A.J.S.C.) As such, defendant remains a patient at Mid-Hudson, a secure facility run by the New York State Department of Mental Health.
In rendering a decision, post-hearing, on defendant’s petition, the first question this court must answer is what issues do this court’s rehearing and review encompass. In other words, the court must first determine the extent of its review of Justice Freehill’s prior determination. The State contends, citing to Matter of Norman D. (3 NY3d 150, 155 [2004]), that the only issue within the purview of this court is the “question of mental [illness] and the need for retention of the [patient].” The defendant contends that the rehearing should encompass all issues related to both the mental status of the defendant and the need for his confinement but further argues that the court can also review and change, if appropriate, the place and type of confinement, i.e., whether defendant should be placed in a secure or a nonsecure facility.
In answering this question, this court begins its analysis with a reading of the applicable statutes. Section 330.20 (16) of the Criminal Procedure Law provides as follows:
“Rehearing and Review. Any defendant who is in the custody of the commissioner pursuant to a commitment order, a retention order, or a recommitment order, if dissatisfied with such order, may, within thirty days after the making of such order, obtain a rehearing and review of the proceedings and of such order in accordance with the provisions of section 9.35 or 15.35 of the mental hygiene law.”
Mental Hygiene Law § 9.35, as referred to therein, similarly provides that upon a rehearing and review of the proceedings already had, “[s]uch justice . . . shall try the question of the mental illness and the need for retention of the patient so authorized to be retained.”
*637 In determining the extent of the review in such proceedings, the Court of Appeals has stated:
“Such a proceeding, by judge or jury, is a review of the earlier record as well as any new evidence presented by the parties concerning the acquittee’s mental status at the time of the rehearing and review. As such it is not a rehearing in the conventional sense, but a de novo evidentiary proceeding, with the findings a snapshot of the acquittee’s condition at that moment. It is a guarantee that the conditions of supervision originally imposed are appropriate at the time of the new proceeding.” (Matter of Norman D., 3 NY3d at 155-156 [emphasis added].)
More recently, the Court of Appeals, in explaining its holding in Matter of Norman D., further stated:
“Although the statute authorizes courts supervising insanity acquittees to issue many types of orders, such as transfer orders, furlough orders and orders of conditions, the right to rehearing and review was extended to only three: commitment, recommitment and retention orders (see CPL 330.20 [16]). The other orders excluded from rehearing and review relate not to the liberty question of whether inpatient treatment is warranted but to specific aspects of patient treatment, suggesting that the Legislature did not contemplate a jury (or a court, if a jury is waived) to revisit those types of issues on rehearing and review.” (Matter of Jamie R. v Consilvio, 6 NY3d 138, 151-152 [2006].)
In fact, the Court of Appeals in Matter of Jamie R. specifically stated:
“We explained in Norman D. that, by referencing Mental Hygiene Law § 9.35, the Legislature intended to provide insanity acquittees’ rehearing and review rights comparable to [those of] civilly committed patients.’ If we were to recognize a right to rehearing and review of what is essentially a transfer decision, we would be granting to insanity acquittees a broader procedural right not generally available to civil patients. We see no evidence in this statutory scheme that such a consequence was intended by the Legislature.” (6 NY3d at 153.)
In other words, the only issue that is the subject of a rehearing and review, specifically identified in Mental Hygiene Law § 9.35, *638 “is the basic liberty issue of whether a patient should be held in OMH custody.” (Id. at 152-153.) Thus, the secure versus non-secure placement of a patient is not reviewable pursuant to CPL 330.20 (16) and Mental Hygiene Law § 9.35 in a rehearing and review proceeding. (Id. at 150, citing Norman D., 3 NY3d at 155-156.) Based on the foregoing, it is the opinion of this court that the only issues to be decided are whether defendant suffers from a mental illness and whether further retention is needed.
As set forth above, in determining whether defendant suffers from a mental illness, the court must look at the defendant’s condition as it is at the time of the rehearing, i.e., a “snapshot” of the defendant’s present condition. (See Norman D., 3 NY3d at 155.) Defendant argues that, under that analysis, defendant does not suffer from a mental illness. To the contrary, the State argues that defendant continues to suffer from a “dangerous mental disorder” pursuant to Criminal Procedure Law § 330.20 (1) (c) as Justice Freehill determined in his December 12, 2008 decision and order.
As is relevant to the within proceeding,
“ ‘Mentally ill’ means that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant’s welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment.” (CPL 330.20 [1] Ed].)
Whereas a person suffers from a “dangerous mental disorder” when that person “currently suffers from a ‘mental illness’ as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law” and “because of such condition he currently constitutes a physical danger to himself or others.” (CPL 330.20 [1] [c] [i], [ii].)[3]
Applied here, this court finds that the defendant Timothy Makas suffers from a mental illness, as opposed to a dangerous mental disorder, and further retention is needed in accordance with the order of Justice Freehill. The evidence at the hearing and the documents submitted to the court establish that defendant, while still in need of some psychiatric treatment, does *639 not pose a danger to himself or others. For the last almost 12 years, since May of 1998 when the defendant set two fires at two different locations, the defendant has not engaged in any violent actions whatsoever. (See tr dated Feb. 11, 2010 at 116-117.) In addition, defendant has not had any recent ideations with regard to setting fires, does not appear to be interested in setting fires and is not interested in firemanics generally. (See tr dated Mar. 4, 2010 at 51-52, 128-130; tr dated Feb. 11, 2010 at 132-133.) Nor is there any evidence that defendant has made any threats to others, has had any thoughts of homicide, or has harmed himself. (See tr dated Feb. 11, 2010 at 76-78.) In fact, Dr. May testified that even when defendant was assaulted in his ward, defendant took no action against the offending person except to report the assault. (See tr dated Feb. 11, 2010 at 13-15; tr dated Jan. 29, 2010 at 46-48; tr dated Mar. 4, 2010 at 56-57.) And, despite the fact that defendant is generally uncooperative and forceful in his opinions during treatment sessions, he is nonthreatening nevertheless. (See tr dated Jan. 29, 2010 at 35-37, 183-185.) Furthermore, despite his complaints, defendant is compliant with his medication orders. (See tr dated Jan. 29, 2010 at 50-52; tr dated Feb. 11, 2010 at 83-84, 153-155; tr dated Mar. 4, 2010 at 57-58.)
The evidence at the hearing also establishes that defendant is considered to be a low risk for future violence as to both himself and others. Specifically, Dr. Kostas A. Katsavdakis, a clinical psychologist who was appointed by the court in 2007 to evaluate the defendant, testified that defendant is a low risk for future violence and gave several reasons for his opinion:
“[I]n terms of recidivism of Mr. Makas he would be considered a low risk for this type of arson for a number of reasons:
“Number one, he has no prior history of arson or fire setting that’s been documented or reported, including early onset of interest in matches or setting fires.
“Number two, is age associated with lower risk.
“Number three, he has no history of severe family violence, which is again associated with increase risk.
“[Number four], he does not have antisocial personality disorder.
“Number five, in interviewing him and looking at records there didn’t seem to be excitement and ela *640 tion during the setting of the fire, which is a very important factor, Your Honor when you’re dealing with an arsonist.
“So, it would be in my opinion an expressive — the act would be caused by an expressive person type and his risk would be low and again that comes from scientific literature.” (See tr dated Mar. 4, 2010 at 17, 51-52.)
Dr. Katsavdakis further testified that several HCR 20 risk assessments for future violence indicated defendant is a low risk for future violence. (See tr dated Mar. 4, 2010 at 47-48; see also defendant’s exhibit C, report of Dr. Katsavdakis dated Jan. 14, 2008.[4]) Additionally, according to Dr. Katsavdakis, a “Hair [sic] Psychological Check List” (revised) test conducted on defendant, which assesses risk for future violence, showed the defendant in the second percentile, at an extremely low risk. (See tr dated Mar. 4, 2010 at 46-48.) Dr. Katsavdakis also noted that although the defendant does have a history of serious violence, that history is limited to the one incident where he started two fires on the same day. (See tr dated Mar. 4, 2010 at 24.)
There are several other examples that support this court’s opinion that defendant is a low risk for future violence as well. For example, at the time of defendant’s initial arrest in 1998, the defendant was released on bail without incident. (See tr dated Jan. 29, 2010 at 66-67; tr dated Feb. 11, 2010 at 114, 116.) Moreover, defendant has had no incidents of violence prior to age 40. According to Dr. Richard May, a psychiatrist employed by the Mid-Hudson Forensic Psychiatric Center in New Hampton, had defendant been younger when he set the fires, it would have been “considered a major and serious factor of his being dangerous in the future.” (See tr dated Jan. 29, 2010 at 203-204.) In addition, according to Dr. Katsavdakis, defendant has a history of steady employment and, although defendant had abused alcohol at the time of the fires to self-manage his depression, has not used illegal drugs. (See defendant’s exhibit C at 25.) In his detailed report, Dr. Katsavdakis states:
“Mr. Makas currently did not demonstrate negative or pro-criminal attitudes that have some impact on the likelihood of criminal behavior in the future . . . [Mr. Makas] ‘does not currently demonstrate active symptoms of a mental illness. There are no *641 documented reported incidents of acute depressive or psychotic symptoms.’ ” (See defendant’s exhibit C at 25.)
Furthermore, defendant’s full-scale IQ score of 112 places him within the above-average range of intellectual functioning. Defendant’s performance IQ score of 121 places him within the superior range of intellectual functioning. (See defendant’s exhibit C at 21.)
Despite these opinions that defendant is a low risk for future violence, it is clear that the defendant displays evidence of paranoia. In October of 2007, defendant wrote a letter to the Office of the Commissioner of Mental Health requesting that “staff not openly discuss patient’s birthdays due to identity theft and ‘invasions of [medical] privacy.’ ” (See defendant’s exhibit C at 19.) Moreover, defendant has been somewhat suspicious of staff members and groups in which he is involved. (See tr dated Mar. 4, 2010 at 54-55, 58.) Thus, this court finds that defendant suffers from a mental illness.
Respondent, however, would have this court go even further and find that defendant suffers from a dangerous mental disorder. Such finding, according to respondent, is based upon the opinions of its witnesses that defendant is dangerous as evidenced by the crimes he committed 12 years ago and his lack of “enthusiasm” in the treatment process. (See tr dated Jan. 29, 2010 at 200-203; tr dated Feb. 11, 2010 at 137-138.) While this court recognizes that the original crime is not to be disregarded since, if anything, it leads one to understand the possible capabilities of the defendant, this court finds that what is more significant in its analysis is that since his past offenses, defendant has neither recidivated nor engaged in any violence.
In support of respondent’s position that defendant suffers from a dangerous mental disorder, respondent called Dr. Krista Sickler, a clinical psychologist employed by the Mid-Hudson Forensic Psychiatric Center in New Hampton, New York. (See tr dated Jan. 27, 2010 at 21, 25-26.) Of all of the witnesses who testified during the hearing, Dr. Sickler perhaps had the closest contact with the defendant. Yet, the court gives the least amount of “weight” to Dr. Sickler’s testimony and report. To begin, the “Psychological Evaluation” report offered in evidence as exhibit 5 was authored by a “psychology extern” under Dr. Sickler’s direction, the original of which was lost, and the report moved into evidence is only “reflective of the original, however, not identical” to it. (See respondent’s exhibit at 3.) While this court *642 has considered the report, it assigns little weight to said report given its lack of detail and supporting data. More interesting, however, is that there is little, if any, contradiction between the “Sickler” report and the testimony and detailed report of Dr. Katsavdakis. In other words, there is certainly nothing in the “Sickler” report that clearly indicates that the defendant is a danger to himself or to others. Rather, the writer merely complains about the defendant’s lack of participation with others in group sessions, and makes a somewhat vague reference to a lack of acceptance of responsibility for the fires which defendant set. (See State’s exhibit 5 at 2.)
The court recognizes that there is a strong presumption that defendant suffers from a dangerous mental disorder based on the violent nature of the crimes he committed. (See Matter of George L., 85 NY2d 295, 306 [1995].) In fact, the Court of Appeals noted in Matter of George L.:
“The recent commission of a violent act significantly increases the probability that an individual will commit further such acts in the future. This judgment is not simply a popular notion; the clinical consensus is that a history of violent behavior in an individual is the single best predictor of future violence.” (85 NY2d at 306, quoting Ingber, Note, Rules for an Exceptional Class: The Commitment and Release of Persons Acquitted of Violent Offenses by Reason of Insanity, 57 NYU L Rev 281, 295-296 [1982].)
Applied here, however, defendant has presented ample evidence to rebut that presumption. Moreover, the circumstances of the within matter are easily distinguishable from those set forth in Matter of George L. In that case, the determination of whether the defendant suffered from a dangerous mental disorder took place a mere 17 months after the defendant attempted to murder his father. Whereas, in the instant matter, the crimes defendant committed took place approximately 12 years ago with no further acts of violence since that time.
Based on the foregoing, this court finds that the defendant suffers from a mental illness and is in need of treatment and retention in a facility for that purpose.
Notwithstanding this court’s view that, on a rehearing and review, the placement of defendant is not an issue for the court to decide, this court nevertheless believes that retention of the defendant need not be in a secure facility such as Mid-Hudson Forensic Psychiatric Center, but that the defendant need only *643 be placed in a facility for those who are civilly committed pursuant to Mental Hygiene Law § 9.35 et seq. As set forth above, while this court is of the opinion that defendant suffers from a mental illness and needs treatment in a hospital setting, this court does not believe the defendant suffers from a “dangerous mental disorder” pursuant to CPL 330.20 (1) (c) to warrant his placement in a secure facility. Rather, based on the evidence adduced at the hearing, a civil setting is appropriate under the circumstances. Due to the limits of this court’s review, however, the court cannot issue an order changing the commitment from a secure to a nonsecure facility as the court does not have the authority to do so.
Based on the foregoing, it is hereby ordered, adjudged and decreed that defendant suffers from a mental illness and that defendant shall remain at Mid-Hudson Forensic Psychiatric Center pursuant to Justice Freehill’s order.

. The decision and order dated December 12, 2008 is a second retention order as defined in section 330.20 (1) (h) of the Criminal Procedure Law.

. As permitted by Mental Hygiene Law § 9.35, defendant waived his right to “the trial of the fact by a jury.”

. “ ‘Mental illness’ means an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation.” (Mental Hygiene Law § 1.03 [20].)

. Dr. Katsavdakis’ report is the single most detailed and documented report received in evidence.